IN THE MATTER OF THE APPEAL OF SAM SCHNEIDER
FROM AN ORDER OF THE DIRECTOR OF THE DIVISION
OF ALCOHOLIC BEVERAGE CONTROL, DATED DECEM-
BER 27TH, 1950.

Superior Court of New Jersey
Appellate Division

Argued March 12, 1951—Decided March 26, 1951.

452

Before Judges McGeehan, Jayne, and Wm. J. Brennan, Jr.

*Mr. Walter D. Van Riper* argued the cause for appellant.

*Mr. Samuel B. Helfand,* Deputy Attorney-General, argued the cause for respondent (*Mr. Theodore D. Parsons,* Attorney-General of New Jersey).

The opinion of the court was delivered by

Jayne, J. A. D. On December 27, 1950, the Director of the Division of Alcoholic Beverage Control suspended for the remainder of its term the plenary retail consumption license theretofore issued to the appellant for the premises known as the Ocean House at Toms River.

The formal charge from which the suspension of the license ensued was that:

"On June 21, 1950, and on divers dates prior thereto, you allowed, permitted and suffered lewdness and immoral activities in and upon your licensed premises, *viz.*, the renting of rooms for purposes of illicit sexual intercourse; in violation of Rule 5 of State Regulations No. 20."

The director stated, "I am satisfied that the ABC agents' testimony portrays a true picture of events which took place at the times in question."

We quote his summary of the testimony adduced at the hearing:

"An ABC agent testified that on Saturday, June 17, 1950, at 12:01 a. m., he and a fellow-agent visited defendant's licensed premises. The witness described the premises as follows: 'It is a large frame building operating as a hotel. They have rooms on the second and third floors and a package goods department in the front of it. Part of the building consists of a grocery store front and as you enter to the barroom, through a stairway, he has a large oval shaped bar.' The ABC agent testified that he entered into conversation with the defendant and inquired from him whether he and his companion might hire rooms as they had a 'couple of girls' and would 'like to use the rooms for an hour or so to have intercourse with them.' The defendant, according to the testimony of the witness, stated, 'I don't give a——if you use it for an hour or a week as long as I get paid for the room,' and agreed to let them have rooms, each room's rent to be $5 per couple. In response to the agent's inquiry regarding baggage, the defendant said, 'No, you don't need any baggage, you register as "Mr. and Mrs."' The agent testified that he told the defendant that the girls were not there, but he would let him know when he needed a room.

The witness further testified that the agent who accompanied him on June 17, 1950, and three other ABC agents arrived in the vicinity of defendant's licensed premises on Wednesday night, June 21, 1950. The witness testified that he and the agent who had accompanied him on the previous occasion entered the premises together at 9:30 p. m. They took positions at the bar near one of the other agents who had preceded them into the premises and thereupon again engaged in conversation with the defendant. The witness testified that he told the licensee that they would like to hire a couple of rooms as they brought a couple of girls, married women, and would want the room for about an hour for the purpose of engaging in sexual intercourse. The licensee reassured the agents that it was not neces-

sary that they have baggage. The licensee thereupon spoke to his wife and the latter approached the agents, saying, 'Sam told me you fellows want to rent a couple of rooms.'

The wife, subsequently identified as Rose Schneider, led the two agents to the second floor and showed them two rooms, Nos. 11 and 12, which the agents agreed to hire. Each agent thereupon signed the register—one as Mr. and Mrs. Frank Arthur and the other as Mr. and Mrs. Warner. Upon inquiry by Mrs. Schneider as to 'Where are the women?,' the agent answered, 'Well, they are two married women; they don't want to come here in the hotel with us because they are afraid of getting into trouble.' Mrs. Schneider then said, according to the agent's testimony, 'These girls don't come from Toms River?' 'No, they are not from Toms River,' the agent replied. Mrs. Schneider then said, 'That's good, I don't want to get into trouble with anybody if they know what is going on around here.' Each agent paid Rose Schneider $5 for the respective rooms, the numbers of the money being used therefor having previously been noted. The agents then ordered a bottle of wine and four glasses, all of which were brought to them by Rose Schneider, for which payment to her in the amount of $1 was made. The agent testified that Mrs. Schneider, when leaving the room, said, 'Have a good time, boys.' "

In our examination of the transcript of the evidence we note significantly the answers of the appellant to the following questions:

"Q. They say if anybody else was coming in the room with them? A. Not that I know of."

"Q. Were you told at any time, or did you know that these men intended to bring women in the hotel? A. Not that I know of."

"Q. Do you recall that at least two agents testified this morning that when you entered the room, they said to you 'What are these two men doing here?' and you said 'These men are waiting for their wives.' Is that what you said when you first went in Room 12? A. I don't know."

■ ■ The director's factual conclusion that the licensee-appellant rented "rooms for purposes of illicit sexual intercourse" is adequately warranted by the evidence. The proceedings are civil in nature and not criminal. *Kravis v. Hock,* 137 *N. J. L.* 252 (*Sup. Ct.* 1948).

It is acknowledged that the agents who obtained the accommodations never had any intention of using them for the purpose of sexual intercourse and that no women accom-

panied the agents or were expected to participate in the plan.

The insistence of counsel for the appellant is that the order under review was not justified as a matter of law.

The Legislature empowered the commissioner (director, *R. S.* 52:17B–51) to "make such general rules and regulations and such special rulings and findings as may be necessary for the proper regulation and control of the manufacture, sale and distribution of alcoholic beverages," embracing such subjects, *inter alia,* as disorderly houses, prostitution, orderliness, and decency. *R. S.* 33:1–39.

In pursuance of that authority Rule 5 of State Regulations No. 20 was promulgated, which reads:

"No licensee shall allow, permit or suffer in or upon the licensed premises any lewdness, immoral activity, or foul, filthy or obscene language or conduct, or any brawl, act of violence, disturbance or unnecessary noise; nor shall any licensee allow, permit or suffer the licensed place of business to be conducted in such manner as to become a nuisance."

Anent the intent and construction of the Alcoholic Beverage Control Law the Legislature declared, "This chapter is intended to be remedial of abuses inherent in liquor traffic and shall be liberally construed." *R. S.* 33:1–73.

The governmental power extensively to regulate the conduct of those privileged to maintain premises for the sale of intoxicating liquors, especially by retail, has uniformly been accorded broad judicial support. *Meehan v. Excise Commissioners,* 73 *N. J. L.* 382 (*Sup. Ct.* 1906), affirmed 75 *N. J. L.* 557 (*E. & A.* 1908); *Franklin Stores Co. v. Burnett,* 120 *N. J. L.* 596 (*Sup. Ct.* 1938); *Phillipsburg v. Burnett,* 125 *N. J. L.* 157 (*Sup. Ct.* 1940); *Grant Lunch Corp. v. Driscoll,* 129 *N. J. L.* 408 (*Sup. Ct.* 1943), affirmed 130 *N. J. L.* 554 (*E. & A* 1943), cert. den. 320 *U. S.* 801, 88 *L. Ed.* 484, 64 *S. Ct.* 430 (1944)

"The whole machinery of the Alcoholic Beverage Control statute is designed to control and keep within limits

a traffic which, unless tightly restrained, tends toward abuse and debasement." *Kravis v. Hock*, 135 *N. J. L.* 259 (*Sup. Ct.* 1947), reversed on other grounds, 136 *N. J. L.* 161 (*E. & A.* 1947).

"The liquor business is one that must be carefully supervised and it should be conducted by reputable people in a reputable manner." *Zicherman v. Driscoll*, 133 *N. J. L.* 586 (*Sup. Ct.* 1946).

And then, moreover, it must be understood that a license to vend intoxicating liquor is not a contract. *Lantz v. Hightstown*, 46 *N. J. L.* 102, 107 (*Sup. Ct.* 1884); *Meehan v. Excise Commissioners, supra.* It is not property. *R. S.* 33:1–26. In reality it is merely a temporary permit or privilege to pursue an occupation otherwise illegal. *Voight v. Board of Excise*, 59 *N. J. L.* 358 (*Sup. Ct.* 1896); *Drozdowski v. Sayreville*, 133 *N. J. L.* 536 (*Sup. Ct.* 1946); *Takacs v. Horvath*, 3 *N. J. Super.* 433 (*Ch. Div.* 1949).

And so the words of Justice Van Syckel speaking for the Court of Errors and Appeals in *Paul v. Gloucester County* in 1888, 50 *N. J. L.* 585, continue to reverberate: "The sale of intoxicating liquor has, from the earliest history of our state, been dealt with by legislation in an exceptional way. It is a subject by itself, to the treatment of which all the analogies of the law, appropriate to other topics, cannot be applied." *Hudson Bergen, &c., Ass'n. v. Hoboken*, 135 *N. J. L.* 502 (*E. & A.* 1947); *Essex Holding Corp. v. Hock*, 136 *N. J. L.* 28 (*Sup. Ct.* 1947). It is a business which may be restricted by "such conditions as will limit to the utmost its evils." *Crowley v. Christensen*, 137 *U. S.* 86, 34 *L. Ed.* 620 (1890). The responsibility of a licensee may in some circumstances be imposed where, regardless of his knowledge, there is a failure to prevent the prohibited conduct by those entrusted with the management of the licensed premises. *Essex Holding Corp. v. Hock, supra; Cedar Restaurant & Cafe Co. v. Hock*, 135 *N. J. L.* 156 (*Sup. Ct.* 1947); *Galsworthy, Inc. v. Hock*, 3 *N. J. Super.* 127 (*App. Div.* 1949).

It is in this state of the law that we are at liberty to construe Rule 5 of the Regulations liberally within the boundaries of its obvious intent and object. It is to be at once recognized that the Regulations apply fundamentally to the behavior and responsibilities of the licensee. It would be fantastic to suppose that a licensee who himself personally disobeys the regulation does not "allow, permit and suffer" the occurrence of the violation. However, in the present case the licensee allowed, permitted and suffered his wife to engage in the undertaking. We are therefore confronted with the question whether the mere renting of bedrooms in the licensed premises by a licensee with the belief and intention that they will be occupied for the purposes of illicit sexual intercourse is an immoral activity within the signification of Rule 5. We answer the question in the affirmative.

The appellant was charged with renting the rooms for an illegal purpose. A purpose is that which one sets before oneself as an object to be attained; the end or aim to be kept in view in any plan, measure, exertion or operation; design; intention. *Webster's New International Dict.* (2d ed.); *vide, Sawter v. Shoenthal,* 83 *N. J. L.* 499, 500 (*E. & A.* 1912). It would seem that the commission of an overt act on the licensed premises in furtherance or promotion or encouragement of an illicit purpose is in itself an immoral activity comprehended by the scope of the regulatory rule.

In the determination of the present appeal we are not concerned with whether the appellant's activity constituted an indictable common law or statutory crime. *Cf. State v. Baldino,* 11 *N. J. Super.* 158 (*App. Div.* 1951); *State v. Damorjian,* 204 *N. W.* 498 (*Sup. Ct. Wis.* 1925). We are dealing here with a purely disciplinary measure and its alleged infraction.

The pith of the criticism of the action of the director in suspending the enjoyment of the license is that the appellant should have been exonerated because despite his unbecoming and objectionable intent and purpose, illicit sexual

intercourse was (1) not in fact in this instance committed on the licensed premises, and (2) its commission was not in reality anticipated by the investigating agents. In what respect those circumstances exculpate the licensee from the profligacy of his own deliberate misconduct is not clear. So far as the appellant as the licensee of the premises could act, he made the accommodations available and conferred his permission to utilize them in an immoral pursuit.

The point advocated in behalf of the appellant that the investigators sought nothing more than evidence is not a novel one in proceedings implicating alleged violations of license privileges. *Vide, Black v. MacMahon,* 130 *N. J. L.* 323 (*Sup. Ct.* 1943); *State Board of Medical Examiners v. Coleman,* 132 *N. J. L.* 64 (*Sup. Ct.* 1944).

Here, too, the director has construed the promulgated regulatory rule to be sufficient to encompass the impugned conduct of the appellant. *Cf. Bowles v. Seminole Rock & Sand Co.,* 325 *U. S.* 410, 414, 89 *L. Ed.* 1700, 65 *S. Ct.* 1215 (1945).

The object manifestly inherent in the rule with which we are here concerned is primarily to discourage and prevent not only lewdness, fornication, prostitution, but all forms of licentious practices and immoral indecency on the licensed premises. The primary intent of the regulation is to suppress the inception of any immoral activity, not to withhold disciplinary action until the actual consummation of the apprehended evil.

"Immorality" is not necessarily confined to matters sexual in their nature. In a given context the word may be construed to encircle acts which are *contra bonos mores,* inconsistent with rectitude and the standards of conscience and good morals. Its synonyms are: corrupt, indecent, depraved, dissolute; and its antonyms are: decent, upright, good, right. *Webster's International Dict.* (*2d ed.*).

The order of the Director of the Division of Alcoholic Beverage Control here subjected to review is affirmed.