17 N.J. Super. 564 (1952)
86 A.2d 430
IN THE MATTER OF DISCIPLINARY PROCEEDINGS AGAINST VIRGINIA P. LARSEN, T/A OLE'S RANCH, DUTCHTOWN ROAD, KRESSON, VOORHEES TOWNSHIP, P.O. MARLTON RFD, N.J., HOLDER OF PLENARY RETAIL CONSUMPTION LICENSE C-2 FOR THE 1950-51 AND 1951-52 LICENSING YEARS, ISSUED BY THE TOWNSHIP COMMITTEE OF VOORHEES TOWNSHIP.
Superior Court of New Jersey, Appellate Division.
Argued January 7, 1952.
Decided January 29, 1952.
*567 Before Judges McGEEHAN, JAYNE, and WM. J. BRENNAN, JR.
Mr. Joseph Tomaselli argued the cause for appellant (Messrs. Malandra & Tomaselli, attorneys).
Mr. Samuel B. Helfand, Deputy Attorney-General, argued the cause for respondent (Mr. Theodore D. Parsons, Attorney-General of New Jersey).
*568 The opinion of the court was delivered by JAYNE, J.A.D.
On October 22, 1951, the Director of the Division of Alcoholic Beverage Control suspended for a period of 180 days the plenary retail consumption license theretofore issued to the appellant for the premises known as Ole's Ranch in Voorhees Township.
The alleged infraction which occasioned the disciplinary proceedings was that on May 31, 1951, and on divers days prior thereto, the licensee allowed, permitted, and suffered lewdness and immoral activity in and upon the licensed premises, viz., the renting of rooms for the purpose of illicit sexual intercourse, in violation of Rule 5 of State Regulations No. 20. Vide, R.S. 33:1-26, 31, 39, 73; R.S. 52:17B-51.
In the consideration of the present appeal we hold fast to the legal principles that we have heretofore deemed applicable to similar proceedings as announced in our recent decisions in In re Schneider, 12 N.J. Super. 449 (App. Div. 1951); Greenbrier, Inc., v. Hock, 14 N.J. Super. 39 (App. Div. 1951), certif. den. 7 N.J. 581 (1951).
The subjects debated in the prosecution of the present appeal are: (1) whether the evidence adduced adequately sustains the determination of the Director that the licensee was guilty of the alleged transgression comprehended by Rule 5, State Regulations No. 20; (2) whether the investigatory methods and course of conduct pursued by the agents of the Division in quest of evidence are contrary to law or public policy; and (3) whether the suspension of the license for the stated period of 180 days was inordinately harsh, excessive, and arbitrary.
In view of the pertinent principles of law which by reference to the opinion in the Schneider case, supra, we iterate in the determination of the present appeal, our comment will relate to the three points thus projected.
It is immediately obvious that the testimony, together with the exhibits such as the registration cards, room keys, and identified money, adequately warranted in an evidential respect *569 the factual conclusion that the servants of the licensee in the pursuit of their employment arranged for the rental of, and actually let in the licensed premises, "rooms for purposes of illicit intercourse."
We are earnestly importuned by counsel for the appellant to recognize the appeal as the practical equivalent of a trial before us de novo on the record submitted. The overture sprouts from a speculative perversion of Rule 3:81-13. Interpretative expositions of the import and meaning of this rule have been numerous. We are empowered not only to review the facts and make independent findings thereon, but the exercise of this power is permissive and a litigant may not as a matter of right require our exercise of it. Cf. Rules 1:2-20 and 4:2-6.
In the oral discourse at the argument of this appeal it was pointed out that the Director promulgates the rules, employs the agents to make the investigations, and ultimately adjudicates the merits of the complaints made by and, as here, supported by the testimony of his own representatives. The answer which immediately falls off the tip of the tongue is that in the evolution of governmental administrative and supervisory agencies, the Congress and the state legislatures have constitutionally and quite uniformly delegated to such agencies the power to adjudicate controversies arising within the area of the particular administrative field. The problem of merger of powers of prosecutor and judge in administrative agencies is one with which students of American administrative law have been much concerned. See Schwartz, American Administrative Law, p. 101, et seq (1950). In Brinkley v. Hassig, 83 Fed.2d 351, 356 (C.C.A. 10, 1936), the court stated:
"The spectacle of an administrative tribunal acting as both prosecutor and judge has been the subject of much comment, and efforts to do away with such practice have been studied for years. The Board of Tax Appeals is an outstanding example of one such successful effort. But it has never been held that such procedure denies constitutional right. On the contrary, many agencies have *570 functioned for years, with the approval of the courts, which combine these roles. The Federal Trade Commission investigates charges of business immorality, files a charge in its own name as plaintiff, and then decides whether the proof sustains the charges it has preferred. The Interstate Commerce Commission and state Public Service Commissions may prefer complaints to be tried before themselves."
Vide, Gellhorn, Administrative Law, p. 731, et seq.; Invective and Investigation in Administrative Law, 52 Harv. L. Rev. 1201. The wisdom and prudence of the legislative delegation of such a broad variety of functions to an administrative executive or board are not justiciable subjects.
Strictly, an administrative adjudication is not judicial; hence its characterization as "quasi-judicial" is employed to denote its detachment from the judicial branch of the government. Administrative adjudications are nevertheless subject to judicial review. If, for example, the adjudication offends the State or Federal Constitution, is ultra vires the statutory grant, is unsupported by adequate evidence, or is unreasonable, unjustly discriminatory, arbitrary, or capricious, the intervention of the courts may be invoked.
Of what relevancy to the consideration of the present appeal has the mere breadth of the delegated duties and powers of the Director? We suspect that we are invited even in the absence of any indicative evidence judicially to entertain the inference that the Director by reason solely of his official situation and environment did not critically scrutinize the testimony of his investigators.
Where such a proposed inference is neither based upon evidence nor upon the substructure of common knowledge and experience, it is essentially visionary, resting only upon a foundation purely imaginary and supposititious. To improvise and effectuate such an inference in proceedings of this nature would be an untenable abridgment and unjustifiable weakening of the disciplinary powers expressly conferred upon the Director by the Legislature. Moreover in its pragmatical consequence, the Division of Alcoholic Beverage *571 Control would, as suggested by the Deputy Attorney-General, "become little more than a medium for the transmission of evidence to the appellate court."
Our courts have repeatedly declared that a license to vend intoxicating liquor is not a contract but a privilege. It is a business which may be restricted by "such conditions as will limit to the utmost its evils." It should be carefully supervised and conducted by reputable people in a reputable manner, and the governmental power extensively to regulate the conduct of those privileged to maintain premises for the sale of intoxicating liquors, especially by retail, is accorded broad judicial support. In re Schneider, supra, and cases cited therein.
We therefore decline to fabricate for use in the review of proceedings of this nature artificial inferences of the inevitable existence of the suggested disadvantageous influence in the factual adjudications of the administrative commissioner or director. The normal inference is to the contrary. 42 Am. Jur. 680, § 240.
It must also be realized that it is not within the domain of the courts to dictate the fashion, manner, method, and course of covert action which the Director shall pursue in the investigations he is lawfully authorized to make. Our remedial appellate function enables us to nullify those lines of detection and exposure which offend the law or public policy.
Violations of the character charged in the instant proceedings are undoubtedly difficult to detect and prove, except through the services of governmental investigators. It is said that furtive watchfulness is labor in vain and that timely and opportune invasions of the inn and tavern are too speculative, and that in consequence the investigators by their own solicitations tempt the licensee to transgress the rule of morality.
The words of Justice Minturn in his concurring opinion in State v. Dougherty, 88 N.J.L. 209, 218 (E. & A. 1915), reverberate:
*572 "The dormant energy for transgression, more or less smouldering in human breasts, awaits only the opportunity presented by a more acute, energetic and subtle mind, supported by the apparent respectability, character and social standing of the tempter, to produce the leap that blasts hope and character, and spells moral destruction in an abyss of remorse and shame."
But Horace philosophized that he who is moral and innocent within is well armed to repel the temptation. Anent the motives of the public investigators, see Camden v. Public Service Railway Co., 84 N.J.L. 305 (E. & A. 1913).
We must be aware that we are not here concerned with a conviction of crime but rather with a purely disciplinary proceeding relating to the exercise by the licensee of a highly restricted and conditional temporary privilege to the treatment of which the ordinary analogies of the law are not always made applicable.
The foregoing subjects have evidently filtered into the argument of this appeal because in view of the contradictory state of the evidence on one of the elements of the charge it is sought thereby to induce us to substitute our entirely independent conception of the factual proof.
We perceive in the transcript of the evidence certain components which doubtless contributed a preponderate weight to the verification of the charge. It is acknowledged that the investigators made three visits to the licensed premises and on each occasion conversed with one or both bartenders concerning the availability of rooms. In particular we allude to the testimony of the investigators that after informing the bartender of the use for which they desired the bedrooms, they inquired of him the manner in which the register should be signed and he replied, "Just sign Ben Franklin or John Smith, but put Mr. and Mrs." Such are in fact the registrations. The bartender acknowledged that he told the investigators: "As long as you sign the register and are respectable people, that is all that is necessary." We add the following excerpts from his testimony:
"Q. This conversation before you showed them the rooms, at the time when you made the expression "There will be no trouble,' what *573 occasioned that remark? What was it that the agents said to you which prompted you to say `There will be no trouble'? A. Because there would be no trouble. We don't run that kind of place.
Q. What was it that the agent said to you which prompted you to make that remark? A. I don't know the exact words but it would probably be to the effect  I just don't know why it would bring out anything like that, it must be something pertaining to they was in doubt about something and I told them there would be no trouble because we run everything on a legitimate basis.

* * * * * * * *
Q. There was a question came up between you and the agents as to signing the register, was there not? A. Yes.
Q. What did the agents say to you about registering and what did you say to them? A. I told them we had a regular hotel set-up, we had registration cards and they would have to sign cards like any other hotel.
Q. What was the occasion which brought that conversation up? A. I imagine in answer to one of their questions.
Q. Remember what question it was? A. No.

* * * * * * * *
Q. With that, you also told us that you told him he would have to sign `Mr. and Mrs.'; isn't that what you told us? A. I believe that's correct.
Q. Why did you tell him that if you hadn't inquired about women? A. In answer to one of his questions.
Q. What do you think that question was? A. I wouldn't remember well enough to testify."
The evidence and the derivative inferences are substantial and clearly sufficient to sustain the factual finding of the Director. Traymore of Atlantic City, Inc., v. Hock, 9 N.J. Super. 47 (App. Div. 1950).
The remaining ground of appeal relates to the reasonableness of the period during which the license is to be suspended. The duration of the suspension of the privileges of a liquor license rests within the sound discretion of the Director. Grant Lunch Corp. v. Driscoll, 129 N.J.L. 408 (Sup. Ct. 1943), affirmed 130 N.J.L. 554 (E. & A. 1943), cert. den. 320 U.S. 801, 88 L.Ed. 484 (1944); Galsworthy, Inc., v. Hock, 3 N.J. Super. 127 (App. Div. 1949); R.S. 33:1-31.
The contention that the period of the suspension *574 should vary in proportion to the contradictory state of the proof of the infraction is unimpressive.
A suspension for 180 days appears to have been the disciplinary forfeiture uniformly exacted from licensees who through willfulness or laxity are responsible for a transgression of this nature. Cf. In re Hartman, Bulletin 904, Item 2; In re Molenaro, Bulletin 910, Item 1; In re McCarthy, Bulletin 919, Item 3; In re Schneider, supra.
The order here subjected to review is affirmed.
WILLIAM J. BRENNAN, JR., J.A.D. (concurring).
Concern with the problem of merger of the powers of prosecutor and judge in the same agency springs from the fear that the agency official adjudicating upon private rights cannot wholly free himself from the influences toward partiality inherent in his identification with the investigative and prosecuting aspects of the case; in other words, that the atmosphere in which he must make his judgments is not conducive to the critical detachment toward the case expected of the judge. In a sense the combination of functions violates the ancient tenet of Anglo-American justice that "No man shall be a judge in his own cause." Bonham's Case, 8 Co. 113b, 118a, 77 Eng. Rep. 646, 652 (K.B. 1610). "The litigant often feels that, in this combination of functions within a single tribunal or agency, he has lost all opportunity to argue his case to an unbiased official and that he has been deprived of safeguards that he has been taught to revere." Report of the Attorney-General's Committee on Administrative Procedure, 204 (1941), Sen. Doc. No. 8, 77 Cong., 1st Sess., 204 (1941).
Here the degree of concentration of functions in the Director himself is virtually complete. He is responsible for the direct supervision of every function of his agency. He has broad authority to create such divisions, and alter them, "in such manner and at such times as he considers advisable." R.S. 33:1-4(a). See L. 1948, c. 439, sec. 17, p. 1713; R.S. 52:17B-17. He appoints and removes the *575 investigators and legal assistants engaged in the investigative and prosecuting functions. His assistants are not subject to or protected by the civil service laws. He may remove investigators for cause after three years' service, and legal assistants (and investigators with less than three years' service) for any or no cause at any time. R.S. 33:1-4(d) and (f). He orders such investigations as he "shall deem proper in the administration" of the act, issues the complaints, prosecutes the charges and then decides whether the proof sustains the charges preferred. R.S. 33:1-35. True, the actual investigating, the determination whether complaints shall issue, the issuance of the complaints and the making of the record at the hearings is doubtless done almost entirely by his assistants without his personal participation. But, "The crux of the matter lies in the concentration of functions, * * *. * * * `can there be a practical separation of prosecuting and deciding functions where both are subject to one ultimate authority?' * * *." Schwartz, American Administrative Law, p. 104 (1950).
There is no question of the legislative authority to make this broad delegation of powers. No constitutional inhibitions or violations of due process are involved. However, there is general agreement that there is substance in the fear that in such concentration inheres the danger of partiality in judgments having an impact upon private rights and that the danger cannot be ignored. Pound, Justice According to Law, pp. 78 et seq. (1951); Davis, Administrative Law, c. 10, pp. 386 et seq. (1951); Schwartz, supra, pp. 61 et seq.; Landis, Crucial Issues of Administrative Law, 53 Harv. L. Rev. 1077 (1940); Landis, Administrative Process, p. 34; Cooper, Administrative Agencies and the Courts, pp. 50 et seq. (1951), and the wealth of national and state governmental studies listed in notes 2 to 8, inclusive, to Mr. Justice Jackson's decision in Wong Yang Sung v. McGrath, 339 U.S. 33, 94 L.Ed. 616 (1950).
It is conceded by most commentators that the problem can be best dealt with by legislation, as its solution implicates *576 considerations of administrative efficiency in effectuating legislative policy. The most notable example of a legislative effort is the Federal Administrative Procedure Act of June 11, 1946, 60 Stat. 237, 5 U.S.C.A., secs. 1001 et seq., applicable to federal administrative agencies. That statute embodies the theory of internal separation, leaving the functions with the agency but providing safeguards to assure their insulation from one another and to further the independence of personnel engaged in judging. The United States Supreme Court has said that the act's "fundamental purpose" is "to curtail and change the practice of embodying in one person or agency the duties of prosecutor and judge" and "to ameliorate the evils from the commingling of functions," Wong Yang Sung v. McGrath, supra. The federal statute has not, however, escaped criticism; it has been said that it deals only partially with the problem of separation. "Ultimate decision still rests with the agency, which also exercises general supervision over investigation and prosecution." Schwartz, supra, p. 104. In our own State a proposed administrative procedure act is again before the Legislature (Senate Bill No. 48, introduced January 21, 1952). The proposed bill goes further than the federal act in the direction of complete separation of functions.
The problem becomes one of judicial cognizance when we scrutinize the evidence underlying the Director's decision. The now generally accepted gauge of administrative factual finality is whether the finding is supported by substantial evidence. That test will usually appear in remedial legislation, Federal Administrative Procedure Act, sec. 10 (e) (5); it is included in the proposed New Jersey Senate Bill No. 48. But the test long antedated any legislation. It is the product of judicial thinking that the courts have a duty to supervise administrative justice "in a political scheme grounded upon the wisdom of checks and balances to prevent usurpation and arbitrary exercise of power by any one of the three branches of government," that "judicial review of administrative decisions constitutes a vital and essential feature of the total *577 plan, and the substantial evidence rule stands as a rather considerable fraction of judicial review." Stason, 89 Univ. of Penn. Law Rev. 1026, 1029 (June, 1941); N.L.R.B. v. Thompson Products, Inc., 97 F.2d, 13, 15 (C.C.A. 6, 1938).
Admit that the test is unprecise and susceptible to different application by different courts. Much favored is Dean Stason's definition that the reviewing court should sustain the administrative fact decision if "the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, might have reached the decision." Stason, supra, p. 1038. Admit, also, that references to the substantial evidence test by that name are not to be found with any frequency in the New Jersey decisions; nevertheless it has certainly been followed in effect many times. Are we precluded when applying the substantial evidence test from taking into account the implications of the merger of functions, merely because the Legislature has combined the functions in the Director? I think not. The measure of our duty is to set aside any administrative decision when we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, * * *." "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 95 L.Ed. 456 (1951).
Indeed, our Rule 3:81-13 (cf. Rules 1:2-20 and 4:2-6) actually contemplates a scope of review beyond the limits of the substantial evidence test because the rule empowers us to make independent findings of fact. I am not suggesting that the occasion to use this power should arise too often. We should be cautious in invoking the power at least when dealing, as here, with the fact finding of an experienced agency of demonstrated competence. Cf. Dobson v. Commissioner, 320 U.S. 489, 88 L.Ed. 248 (1943). We should appreciate the undesirability of trying cases de novo from such an agency and of the value of having the agency assume a real *578 responsibility for weighing and considering the facts in a field where it has considerable experience.
The implications of merger stand in bold relief when the Director's factual findings rely heavily on his investigators' testimony. We should, and do, approach the record with the assumption that the Director, despite his official position and environment, conscientiously endeavored to give the same critical scrutiny to the investigators' testimony that an independent judge would have tried to give it. But a relationship of mutual trust and confidence necessarily obtains between the Director and his appointees; the Director naturally and very properly imposes trust and confidence in his investigators or his agency could not function efficiently. When we scrutinize the evidence to assay its quality, therefore, we cannot, it seems to me, close our minds to the plainly implied obstacle to the Director's complete critical detachment which inheres in that relationship. To do so is to risk inviting distrust in litigants of the fairness of the judicial process. And complete critical detachment in appraising testimony of investigators is peculiarly requisite in view of the widespread recognition given the fact that there are "disqualifications produced by investigation (which) are personal psychological ones which result from engaging in (that) type of activity." Report of the Attorney-General's Committee on Administrative Procedure, supra, 56.
The necessity for extensive regulation of the sale of intoxicating liquors to minimize the evils which inhere in the traffic is fully recognized. So, too, that the liquor license is not a contract but a privilege. Nevertheless, a liquor license is of value to the holder and, though not property in any legal or constitutional sense, it may not upon considerations of simple fairness be taken from him capriciously or arbitrarily. Drozdowski v. Sayreville, 133 N.J.L. 536 (Sup. Ct. 1946); State v. Bradish, 95 Wisc. 205, 70 N.W. 172 (Sup. Ct. 1897); Yates v. Mulrooney, 245 App. Div. 146, 281 N.Y.S. 216 (1935). In the Drozdowski case the revocation of a retail liquor license was set aside when two of the three municipal *579 councilmen sitting in judgment gave evidence against the licenses at the hearing. In the Bradish case, a revocation based on the sale of liquor to a minor was set aside when it appeared that one of three members of the town board passing judgment hired the minor to purchase the liquor. Too, we do not hesitate to nullify jury verdicts when extraneous matter having the mere tendency to prejudice gets into the jury room, and will not inquire whether prejudice in fact results. Panko v. Flintkote Co., 7 N.J. 55 (1951); Palestroni v. Jacobs, 10 N.J. Super. 266 (App. Div. 1950).
The dangers of partiality inherent in the merger of functions are greatly minimized if not entirely removed when legislation effectively makes the investigating and prosecuting functions independent of the function of judging. But certainly this court on review cannot ignore them because of some supposed legislative inhibition upon the scope of review spelled out of the delegation of the several inconsistent functions to the agency.
However, there is more in this record than the investigators' testimony alone. The Director could reasonably have found corroboration of that testimony in the inferences he might reasonably draw from the quoted excerpts from the bartenders' testimony, considered with the other evidence mentioned in the majority opinion. I therefore agree that we should in this instance affirm the Director's action.