49 N.J. Super. 299 (1958)
139 A.2d 768
IN THE MATTER OF DISCIPLINARY PROCEEDINGS AGAINST OLYMPIC, INC., APPELLANT,
v.
DIRECTOR, DIVISION OF ALCOHOLIC BEVERAGE CONTROL, DEPARTMENT OF LAW AND PUBLIC SAFETY, STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 10, 1958.
Decided March 17, 1958.
*300 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Louis Santorf argued the cause for appellant.
Mr. Samuel B Helfand, Deputy Attorney-General, argued the cause for respondent (Mr. Harold Kolovsky, Acting Attorney-General of New Jersey, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Olympic, Inc., holder of a plenary retail consumption license, appeals from the conclusions and order of the Division of Alcoholic Beverage Control adjudging it guilty of violating Rule 5 of State Regulation No. 20 and suspending its license for a period of 30 days. This license had some three years before been suspended for 32 *301 days, upon a plea of guilty, for violating curfew and permitting female employees to drink at the expense of male patrons.
The report filed by the hearer fairly summarizes the testimony, and it was concurred in and its conclusions adopted by the Division Director after considering the entire record, the memoranda of counsel, the report itself and the exceptions thereto filed on behalf of the licensee. There is no claim that the basic factual findings of the report lack testimonial support. The basic question, as posed by appellant, is whether the evidence presented established the violation charged.
Rule 5 of State Regulation No. 20 provides:
"No licensee shall allow, permit or suffer in or upon the licensed premises any lewdness, immoral activity or foul, filthy or obscene language or conduct, or any brawl, act of violence, disturbance or unnecessary noise; nor shall any licensee allow, permit or suffer the licensed place of business to be conducted in such manner as to become a nuisance."
The specific charge leveled against appellant was that
"On January 11, 12, 13, 18, 19, February 6, 16 and 17, 1957, you allowed, permitted and suffered your licensed place of business to be conducted in such manner as to become a nuisance, in that you made offers to procure females for patrons for the purpose of prostitution and for acts of perverted sexual relations, introduced females to patrons for such purposes and otherwise conducted your licensed place of business in a manner offensive to common decency and public morals; in violation of Rule 5 of State Regulation No. 20."
On the evenings of January 11, 12 and 18, and February 6 and 16 the licensed premises were visited by three ABC agents, who will hereafter be designated as F, N and M, to investigate alleged complaints of prostitution. They arrived at 10 or 10:30 P.M. and stayed until 1:30 A.M. or later. On January 11 they were served by bartender Morris of whom they inquired concerning three girls sitting at the bar nearby. He told them he knew the girls, and that two of them, Diane and Honey, were "sure bang." This information was accompanied by a gesture of the right arm *302 and fist descriptive of intercourse. He volunteered the further information that Phil, the other bartender, had gone out with Diane and she had asked him to engage in intercourse. To this he added that Honey engaged in acts of perversion. All of this intelligence was transmitted in typical gutter language. Morris asked F if he wanted to meet the girls and the agent said "Sure. Should we buy them a drink?" Morris had Phil serve the girls drinks and later suggested that the agents ask them to dance. Before they could do so Honey was called upon to sing three songs, and after doing so made a telephone call, rejoined her girl friends and left the premises. Agent N asked Morris how much the girls charged and he said "Oh, nothing. You just buy them a few drinks." N then inquired whether they would be in the following night and Morris said they might. As the agents prepared to leave, N told Morris that if the girls came in the following night he should "hold them here for us," to which Morris replied "Don't worry about it. If they don't come, I know of two others who are sure," again making the obscene gesture with his arm and fist.
The agents appeared late on the evening of January 12 and were served by Phil, the second bartender. Sitting nearby were two women, Anne and Renee. Agent F asked Morris about the three girls of the previous evening and was told they had not come in. In answer to a question put by agent M as to whether Anne and Renee engaged in sexual intercourse, Morris said, "Yes, sure." The agents then had Phil serve the girls drinks; the girls joined them, and the men danced with them. Agent F asked the girls if they would go out with them, but they refused and left the tavern at 2 A.M. Morris remarked: "I can't understand it. That Anne I know is a sure " (making the arm and fist gesture), "but the other girl I don't know too much about her."
On the third visit, January 18, F asked Morris if there was "Anything doing tonight?" and he replied it was too early. Agent N then inquired about two girls seated at the *303 bar and Morris said, "They're stiffs. They're just drinkers." At about 11:15 Barresi, president of the corporate licensee, entered the place. Morris told the agents he had shortly before spoken to Barresi on the phone about Anne and Renee, the girls who were present on the evening of January 12, and that "Barresi was mad when he found out that we didn't get any place with them, and that Mr. Barresi had told him to just steer us to broads that are sure, not to let us waste our time." To this Morris added the assurance that he would steer the agents to girls he thought were "sure bangs," accompanying this remark by the now familiar motion of the arm and fist. Just before the agents left at 1:20 A.M. Morris agreed with the suggestion made by one of them that it would be "a good idea if you give me a ring first" before coming to the place. "If there is something sure here then I will let you know,"  and again the movement of the arm.
The agents visited the licensed premises on the evening of February 6. Morris at once asked them: "Did you see those broads that just left? They were in here for a little while but I tried to hold them. I even gave them a drink on the house but they seen the place was dead and they took off." The agents left at midnight.
The final visit was February 16, a Saturday evening. As they sat down at the bar Morris raised seven fingers and said, "There were seven of them in here last night including Honey and Diane." Agent N asked Morris, in crude language which we need not repeat, whether they were going to get women that night for purposes of intercourse, to which Morris replied that it was too early yet. He went on to tell the agents about a girl who had been there the preceding week, looking for some one to take her home, and that when the piano player did so she engaged in perverted sexual relations with him. Agent N then said to Morris, "You could have given us a ring," whereupon the bartender handed agent F a paper and pencil and requested him to write down his name and telephone number so that "if any sure bang comes in I can give you a call." *304 F wrote down a name and phone number, both fictitious, and handed the paper to Morris who placed it in a box on the back bar. Shortly after that the telephone rang, and when Morris returned from answering it he remarked to the agents, "I just got a call from a broad who is asking if a certain guy was in here. I knew that this broad was living with this guy but she's separated now and she said she will be down in a few minutes." The agents waited for her, Morris representing to them that she was "bang stuff." She never arrived. At 1:15 A.M. the agents identified themselves, took possession of the slip of paper on the back bar and the pencil Morris had given them, and proceeded to take Morris' statement.
This account by agent F about what had happened on the several visits to the licensed premises was corroborated by agent N in some detail. Agent M did not testify because he was no longer with the Alcoholic Beverage Control Division. Both F and N stated that aside from their conversations and dealings with Morris and his repeated obscene gesture, there was no lewd or immoral activity on the premises during their five visits.
Morris' testimony was a flat denial of almost everything to which the agent had testified. He had never carried on any conversation with them beyond saying "hello," "good night" and "how are you." He denied ever engaging in any activity to sponsor immoral conduct with female patrons on or off the premises, nor did he know of any such activity having taken place there at any time. His explanation regarding the slip of paper was that he had asked the agents for their names, addresses and phone numbers for the tavern's "mailing list," so that they could be notified of "any change of entertainment and various parties and so forth." These names would then be written in a guest book. There was no explanation for having accepted the slip with only one name and phone number on it. As for Barresi, who managed the premises, he denied ever having told Morris "to steer the agents to the broads that are sure and not to have them waste their time." His rules were *305 very strict; bartenders were not to carry on discussions with patrons, and he had never done or said anything which would permit a bartender to become involved in any immoral activity.
The conclusion reached by the hearer, in which the Director of the Division concurred, was that he was convinced that the testimony of the agents truthfully represented the facts, while that of the witnesses for the licensee was largely compounded of studied and deliberate falsification. We see no reason to disagree. Both the hearer and Director found little room for doubt that Morris' purpose was to encourage the agents to return to the tavern from time to time by holding out the lure of illicit arrangements to be consummated with the women at a future date. In their opinion the conduct on the premises conclusively indicated that the manner of operation of the business was highly improper and that the licensee permitted the place to be conducted in such a manner as to become a nuisance.
Appellant claims that since there was no evidence of actual immoral or improper activity on the licensed premises, the conviction seems unwarranted because it was based on nothing more than "small talk" of bartender Morris. It argues that the private conversations between Morris and the agents should not be construed a nuisance, especially where his utterances were wholly unauthorized. In our view, the conversations and dealings between the agents and Morris were more than innocuous male chit-chat. And as for the assertion that the bartender's activity was "unauthorized," that assuredly presents no valid defense. The licensee's responsibility is not dependent upon the doctrine of respondeat superior, nor upon his personal knowledge or intent or participation; "he is not relieved even if the violations were contrary to his express instructions." Mazza v. Cavicchia, 28 N.J. Super. 280, 284 (App. Div. 1953), reversed upon another ground, but affirming the principle just expressed, 15 N.J. 498, 509 (1954).
No attack is made upon Rule 5 of State Regulation No. 20. It falls well within the authority given the Director *306 by statute to make such rules and regulations "as may be necessary for the proper regulation and control" of the liquor traffic, including such specific objects as prostitution, solicitation, orderliness and decency, and generally "such other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration" of the Alcoholic Beverage Act. N.J.S.A. 33:1-39. The act, intended to be remedial of abuses inherent in liquor traffic, is to be liberally construed. R.S. 33:1-73.
Our courts have long recognized the sui generis character of the liquor trade, and the Legislature has from earliest times treated that subject in an exceptional manner. Mazza v. Cavicchia, above, 15 N.J. at page 505. As was there pointed out, the right to regulate the sale of intoxicating liquors is within the police power and practically without limit, and that power has uniformly been accorded liberal judicial support.
This court has within the past few years had occasion to construe and apply Rule 5 of State Regulation No. 20. See Paddock Bar, Inc., v. Division of Alcoholic Beverage Control, 46 N.J. Super. 405 (App. Div. 1957); Davis v. New Town Tavern, 37 N.J. Super. 376 (App. Div. 1955); Benedetti v. Board of Commissioners of City of Trenton, 35 N.J. Super. 30 (App. Div. 1955); McFadden's Lounge, Inc., v. Division of Alcoholic Beverage Control, 33 N.J. Super. 61 (App. Div. 1954); In re Larsen, 17 N.J. Super. 564 (App. Div. 1952); Greenbrier, Inc., v. Hock, 14 N.J. Super. 39 (App. Div. 1951), certification denied 7 N.J. 581 (1951); In re Schneider, 12 N.J. Super. 449 (App. Div. 1951). The liquor business must be carefully supervised and tightly restrained in the public interest, in accordance with the manifest design of the Alcoholic Beverage Act. As we observed in In re Schneider, above, 12 N.J. Super. at page 458:
"The object manifestly inherent in the rule with which we are here concerned [Rule 5] is primarily to discourage and prevent not only lewdness, fornication, prostitution, but all forms of licentious practices and immoral indecency on the licensed premises. The *307 primary intent of the regulation is to suppress the inception of any immoral activity, not to withhold disciplinary action until the actual consummation of the apprehended evil." (Italics ours.)
This language was approved in the Paddock Bar case, above, where the violation charged was permitting homosexuals to congregate on the licensed premises, and where there was no proof of any immoral activity. The license suspension was sustained because it was the policy and practice of the Division "to nip reasonably apprehended evils while they are in the bud."
Without attempting to detail further the testimony of the conversations and dealings between the agents and the bartender, we find, as did the Division, that the licensee permitted its place of business to be conducted in such a manner as to become a nuisance. If we look to nothing more than the slip of paper on which Morris asked the agent to write his name and phone number, there was present an offer to procure a woman for the purpose of illicit sexual intercourse, natural or otherwise. This would be sufficiently improper to constitute criminal illegality. See N.J.S. 2A:133-2(e). It clearly fell under the ban of Rule 5 and satisfied the charge.
We have not blinked at Morris' other conversations with the agents or his gestures connoting intercourse. These were sufficient to warrant the finding in the Division that the bartender was holding out the lure of sexual entertainment, whether or not in good faith, in order to foster continued patronage by the agents. This, itself, constituted conducting the premises in a manner offensive to common decency and public morals and would justify the conclusion of defendant's guilt of the charge preferred.
It is of no moment that the men to whom Morris talked were actually ABC agents looking for evidence of improper conduct on the licensed premises, nor that what he said may have been (at least in his own private mind) all smoke and no fire  an assumption we are not willing to make. We look at the scene, the talk and the actions with an objective eye: the setting was a licensed tavern, the agents *308 patrons like others at the bar, and Morris' talk and gestures of a kind that could have but one meaning and purpose for those patrons. We regard what was said and what was done in the hard light of the public's continuing and legitimate concern with stringently regulating all activities on licensed premises. The liquor trade must, in the public interest, be conducted in a manner that is beyond all suspicion.
In short, the charge is amply supported by the evidence. The offense charged was complete without any requirement that arrangements for the charged purpose be actually consummated. We do not agree with appellant's claim that there should be a reversal because of the alleged "absence of any immoral or improper activity physically conducted upon the licensed premises." That contention was rejected in the Schneider case, above, 12 N.J. Super. 449 (App. Div. 1951), where the licensee was charged with renting rooms for the purpose of illicit sexual intercourse. No women were present, none was procured or offered to be procured by the licensee, and the agents neither intended to nor did they actually consummate the illicit purpose. No other indecent activity was charged or proved. In affirming the finding of guilt, this court said:
"* * * A purpose is that which one sets before oneself as an object to be attained; the end or aim to be kept in view in any plan, measure, exertion or operation; design; intention. Webster's New International Dict. (2d ed.); vide, Sawter v. Shoenthal, 83 N.J.L. 499, 500 (E. & A. 1912). It would seem that the commission of an overt act on the licensed premises in furtherance or promotion or encouragement of an illicit purpose is in itself an immoral activity comprehended by the scope of the regulatory rule.

* * * * * * * *
The pith of the criticism of the action of the director in suspending the enjoyment of the license is that the appellant should have been exonerated because despite his unbecoming and objectionable intent and purpose, illicit sexual intercourse was (1) not in fact in this instance committed on the licensed premises, and (2) its commission was not in reality anticipated by the investigating agents. In what respect those circumstances exculpate the licensee from the profligacy of his own deliberate misconduct is not clear. So far as the appellant as the licensee of the premises could act, he made the accommodations *309 available and conferred his permission to utilize them in an immoral pursuit." 12 N.J. Super. at pages 457, 458.
As respondent points out, so far as the licensee, through its bartender, could act, it offered to procure women and make them available to the agents with the avowed purpose that they should indulge in illicit sexual intercourse; and the fact that they, for whatever reason, did not actually engage in intercourse with these "sure bangs" does not in anywise detract from the flagrant misconduct theretofore exhibited by the bartender. Any other rule would predicate the licensee's responsibility upon the wholly fortuitous outcome of the unlawful purpose.
As was said in Davis v. New Town Tavern, above, 37 N.J. Super. at page 378, what constitutes interdicted practices on licensed premises may be determinable on a narrower basis than for other places of public resort. See McFadden's Lounge, Inc., v. Division of Alcoholic Beverage Control, above, 33 N.J. Super. at page 68.
Affirmed.