70 N.J. Super. 87 (1961)
175 A.2d 1
MURPHY'S TAVERN, INC., APPELLANT,
v.
WILLIAM HOWE DAVIS, DIRECTOR OF THE DIVISION OF ALCOHOLIC BEVERAGE CONTROL, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 6, 1961.
Decided June 26, 1961.
*88 Before Judges CONFORD, FREUND and KILKENNY.
Mr. George R. Sommer argued the cause for appellant (Mr. Morris Barr, of counsel).
Mr. Samuel B. Helfand, Deputy Attorney General, argued the cause for respondent (Mr. David D. Furman, Attorney General, attorney; Mr. Helfand, of counsel).
The opinion of the court was delivered by FREUND, J.A.D.
Murphy's Tavern, Inc. appeals from an order of the Director of the Division of Alcoholic Beverage Control suspending its retail consumption license for a period of 60 days on the grounds of violation of Rule 5 of State Regulation No. 20, providing that:
"No licensee shall allow, permit or suffer in or upon the licensed premises any lewdness, immoral activity, or foul, filthy or obscene language or conduct, or any brawl, act of violence, disturbance or unnecessary noise; nor shall any licensee allow, permit or suffer the licensed place of business to be conducted in such manner as to become a nuisance."
*89 Appellant, whose establishment is located on Mulberry Street in Newark, was charged in two separate proceedings. The first charge alleged that on October 24, 30 and November 8, 1959 the defendant permitted its licensed premises to become a nuisance in that it "allowed, permitted and suffered thereon persons, males impersonating females, who appeared to be homosexuals," and "allowed, permitted and suffered such persons to frequent and congregate in and upon" the licensed premises, and otherwise conducted the licensed place of business "in a manner offensive to common decency and public morals." The second set of charges was directed towards activities on May 6, 13 and 14, 1960, and asserted that defendant had permitted male persons on the licensed premises "to engage and participate in foul, filthy and obscene conduct and to solicit and make overtures for and arrangements with other male persons * * * for acts of perverted sexual relations"; the substance of the initial charge was also repeated in order to cover the dates in May 1960.
The hearing officer concluded that the Division had established appellant's guilt as to all charges by a fair preponderance of the evidence. The Director concurred in and adopted the findings and conclusions of the hearer. This appeal is predicated solely on the contention that the proofs adduced in the two proceedings do not justify the inference of violation of the regulation as set forth in the charges. It is claimed that all that was demonstrated by the testimony was that persons with effeminate characteristics may have frequented the premises, and that this in itself does not constitute grounds for license suspension.
The initial hearing covered charges directed to activity upon the licensed premises in October and November of 1959. Investigator R., an agent for the New Jersey Division of Alcoholic Beverage Control, testified that he visited Murphy's Tavern on all three of the dates mentioned in the charge. He described the premises as consisting of one small barroom, about 20 x 25 feet in size. On his October 24 *90 visit, he noted about 40 patrons in the place, seated at the bar and milling around. Approximately 20 of the customers attracted his attention because of "their feminine actions and mannerisms, the manner in which they conducted themselves." More specifically, "* * * they would speak to the male seated with them, they would roll their eyes at each other and simulate a kiss now and then, like you would peck a kiss at a person, and occasionally they would put their arm around each other and feel different parts of the body * * *." He added, "We could definitely smell the odor of perfume on the premises."
On his second visit, on October 30, agent R. again singled out about 15 to 20 of the 40 to 45 males on the premises as displaying marked feminine characteristics. On one occasion he observed one male say to another, "`I thought you were going home with me tonight,' and they would grab each other's private parts and simulate kissing each other." Agent R. also witnessed an argument between two male patrons in which obscenities were freely exchanged; he testified that the bartender did not move to halt the dispute. On November 8 the same agent again visited the premises, which were filled to capacity with about 75 to 80 males and one couple. He observed about 20 to 25 of the males "grabbing each other as they would pass going to the men's room * * * they would grab each other's buttocks or each other's private parts * * * they acted as though they were like a man and wife would act. They helped each other drinking and put their arms around one another, and we observed two directly opposite us that had eyebrow pencil on." Later that evening, agent R. had a conversation with bartender Joseph Yeachshino; the investigator, still unrevealed, said, "The kids must have really been dressed up for Halloween," and Yeachshino replied, "if you were new in town and came in here for the first time that night, you would have had a ball with all the [obscenity] in here."
*91 At about 1:50 A.M., as bartender Carmine Lubertazzi began to extinguish the lights in the tavern and as "three of these apparent homosexuals passed him [on their way out] they grabbed him by his private parts, at which time he pulled away * * * laughing and joking with them * * * on one occasion one of the apparent homosexuals kissed Mr. Lubertazzi on the cheek as he left." Several minutes later, agent R. and agent S., who was with him, identified themselves to the bartenders. Lubertazzi was asked whether it was normal for patrons to grab him by his private parts as they left the premises, and he allegedly replied, "That's nothing * * * you could see that in any straight bar too." Agent S asked Lubertazzi if he would kiss him, the agent, also, and the bartender replied, "Sure, if you were my cousin."
Direct examination of agent S. was waived upon the stipulation that he had accompanied agent R. on the three dates mentioned and that his testimony would be entirely corroborative. On cross-examination, he was asked what made him think any of the patrons were homosexuals; he replied, "When you see a man put his arm around another man and rest his head on his shoulder, and another man while he's doing that is rotating his hand on a man's buttocks or grabbing each other by the private parts or kissing each other on the lips or cheeks, is to me apparent homosexuals."
The testimony on behalf of appellant at this initial hearing included that of William R. Peters, a patron of the tavern, who testified that while some of the customers "have fairly high voices," none of them ever annoyed or bothered him and he did not perceive any homosexuals; Lubertazzi, who admitted that persons with feminine characteristics frequented the tavern, said that there were no patrons whom he considered homosexuals, denied that a patron had kissed him on the cheek upon leaving ("* * * I remember this fellow leaning over and saying to me good night, I had a nice time * * * it sort of probably could have looked like a kiss on the cheek, but it wasn't"), and disputed the *92 substance of the alleged conversations with the agents; part-time bartender Theodore Hirsch, who testified that he worked on November 7 and 8, that there were no homosexuals present, and that he did not see anything obscene or improper but that if he saw one male put his hand around another male at the bar he "would tell them to cut it out"; Yeachshino, who conceded that some of the patrons had feminine characteristics but denied that any of them, to his knowledge, were homosexuals, explained possible touching of each other by the patrons on November 8 in terms of the crowded conditions in the tavern ("there was no other way you could have gotten around unless you touched somebody one way or another"), disputed the substance of the "Halloween" verbal exchange with agent R., and maintained that he did not know what the expression, "fag or fairy," meant; Jack Trachtenberg, one of the owners and the manager of the tavern, who stated that there were customers with effeminate characteristics who usually congregated by themselves but that they never bothered other patrons, that the Newark police had the establishment under surveillance for several months in the summer of 1959 but failed to point out to him any people they considered undesirable, and that he did not take any steps to determine whether the effeminate patrons were in fact homosexuals because "the only way * * * is to be approached by one or to actually see them do something," which did not occur in his experience and observation; and Al Thoma, an athletic director at the Newark Athletic Club, who testified that, in his opinion, it is not possible to tell from a person's mannerisms whether he is a homosexual.
At the second hearing, relating to charges focused on May 6, 13 and 14, 1960, three of the respondent's investigators and an administrative inspector testified as to their observations, which were quite similar to those of agents R. and S. on the prior occasions.
Agent D. noted that after he had sat down at the bar on May 6, a male patron named Jimmy (later identified as *93 James Geddings, Jr.) brushed by him, said, "Excuse me," introduced himself and started a conversation. According to the investigator, "through the course of the conversation he was rubbing his left leg against my right leg, and from time to time he placed his hand on my leg. When I was about to leave, he grabbed me in my privates and asked if I was going to return." When agent D. did return to the premises, on May 13, he again encountered Geddings, who once more rubbed the agent's leg and grabbed his privates while attempting to convince him to engage in a sex orgy. The agent was at that time introduced to another male patron named Fred, who openly admired his physique, and, when rebuffed once on a "proposition" to the agent, said, "That is too bad because I could do a lot with that body of yours." Agent D. testified that he mentioned to one of the bartenders, Bruce Adams, that he and Geddings were going to have a sex orgy and asked if Bruce would like to come along; Adams purportedly answered, "No, only with you," and rolled his eyes. Agent D. left the tavern at midnight with Geddings, and they were met outside by the other agents, who identified themselves and brought Geddings into the back room of the tavern for questioning.
The testimony of agent S. was largely repetitive of that of agent D. He observed many of the male patrons calling each other such names as "Honey," "Doll," "Mary," and "Mother." At one point, as he moved down a crowded aisle to the men's room, agent S. accidentally brushed against one of the male patrons, who looked up at him and said, "Oo, no wonder I always sit here, I get to feel all these warm bodies." He also overheard a conversation in which one male said to the other, "Well, I don't go out with him any more. We are incompatible * * * It is better this way. Besides, Artie is so much younger." Agent S. also observed, on May 13, "two males standing very close to each other, facing each other, place their arms about each other in embrace, and moving the lower parts of their bodies in circular motion in time to the music on the juke box."
*94 Agent N. testified that he observed agent D. with Geddings, and he confirmed Geddings' physical advances. He recalled that a patron seated next to him had mentioned, nodding in the direction of agent D., "I wish I could get an introduction to him. He has such a body. There should be a law against that." Administrative inspector D. confirmed the general observations of the other agents.
Appellant produced Jack Schultz, manager of the tavern on the nights in question, Lubertazzi, and Geddings. Schultz and Lubertazzi merely denied that homosexuals congregated in the tavern, to their knowledge, and insisted that they could not evict a patron from the premises simply because of the way he dressed or the manner in which he spoke. Geddings recalled sitting and talking with agent D. but denied that the subject of homosexual relations ever came up or that he had touched the agent's private parts. He emphatically proclaimed that he was not a homosexual. He admitted that he and agent D. had left the tavern about the same time on the evening of May 13, but he asserted that they were not together and that he was just going on to another bar for a drink.
Our review of the proceedings before the Division is to determine whether there is substantial competent primary evidence to support the inferences of violation drawn by the administrative tribunal. In re Larsen, 17 N.J. Super. 564, 573 (App. Div. 1952); Benedetti v. Bd. of Com'rs of City of Trenton, 35 N.J. Super. 30, 34 (App. Div. 1955); Hornauer v. Division of Alcoholic Beverage Control, 40 N.J. Super. 501, 504 (App. Div. 1956). Therefore, to the extent that appellant asks us to reject the testimony of the respondent's agents in the light of the absolute denials of its own witnesses, we must, having found the agents' testimony reasonably credible, reject its contention. As stated in Freud v. Davis, 64 N.J. Super. 242, 246-247 (App. Div. 1960),
"The choice of accepting or rejecting the testimony of witnesses rests with the administrative agency, and where such choice is *95 reasonably made, it is conclusive on appeal. We canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but in order to determine whether a reasonable mind might accept the evidence as adequate to support the conclusion and, if so, to sustain it."
It is further urged that there was no direct proof of the homosexual nature of those patronizing appellant's premises and, alternatively, that even if there was sufficient proof, the mere presence of persons with abnormal physical or emotional tendencies does not, without more, require their exclusion from the premises.
In the first place, the testimony outlined above undeniably demonstrates that an inordinate number of the patrons habitually congregating at the tavern displayed the dress, mannerisms, speech and gestures commonly associated with homosexuals. We have previously held that such concentrated mingling of persons manifesting these characteristics is sufficient foundation for an inference as to their actual condition and tendencies, and warrants punishment of any licensee who acquiesces in their assemblage upon his premises, Paddock Bar, Inc. v. Alcoholic Beverage Control Division, 46 N.J. Super. 405 (App. Div. 1957). Such a result is justified by the Division's policy, supported in law and in its own long-term practice, of thwarting reasonably apprehended sexual misconduct upon licensed premises in its embryonic stages. Cf. In re Schneider, 12 N.J. Super. 449 (App. Div. 1951).
Secondly, aside from the question of actual homosexuality, the proofs herein are, considering our reviewing function, highly persuasive as to the overt acts of lewdness practiced upon the premises. The testimony of the agents with respect to the physical touching of private parts, the simulated kissing, and the suggestiveness of many of the conversations cannot be overlooked in this regard. And the recital of agent D. with respect to his encounter with Geddings, though denied by the latter, could reasonably be believed by the hearing officer and the Director. Agent D.'s direct *96 testimony that he was "propositioned," along with the reports of other conversations overheard by the investigators, provides ample support for the finding of guilt on the charge of soliciting.
It should not be thought that the court is callous to the problem of the homosexual, medically or socially. The public interest in tight control over the liquor business, In re Olympic, Inc., 49 N.J. Super. 299, 306 (App. Div. 1958), certification denied 27 N.J. 279 (1958), involves, however, neither the curative approach of the physician nor the analytical view of the sociologist. The primary concern in this regard is maintenance of accepted standards of public decency and morality, and when these standards are, as here, impinged upon, proper sanctions are not only justified but are demanded.
Affirmed.