[Civ. No. 17693. First Dist., Div. One. Nov. 27, 1957.]

PEARL KERSHAW, Appellant, v. DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL, etc., et al., Respondents.

Popper, Burnstein & Michaels for Appellant.

Edmund G. Brown, Attorney General, and Richard H. Perry, Deputy Attorney General, for Respondents.

WOOD (Fred B.), J.—Petitioner-appellant holds an on-sale general distilled spirits, beer and wine license and operates a restaurant and bar in Oakland. The respondent department revoked the license upon each of four counts: Two counts for violation of section 25601, Business and Professions Code [cause for revocation under subdivision (b) of section 24200]; one count charging grounds for revocation pursuant to section 24200, subdivision (a); and one count charging grounds for revocation pursuant to section 24200, subdivision (e).[1] The

---

[1] The original charges were filed in June, 1955; amended in November to include the charge under subdivision (e) which had been added to section 24200 by ch. 1217, p. 2230, and ch. 1842, p. 3411, of the Stats. of 1955, effective September 7, 1955.

The decision of the respondent department contains detailed findings of fact under two headings (Count I, concerning events occurring between April 23 and May 29, 1955; Count II, events occurring between November 18 and November 27, 1955), followed by "Count III" ex-

penalty of revocation was pronounced separately in respect to each count.

In this mandamus proceeding conducted under authority of section 1094.5 of the Code of Civil Procedure, the trial court found that the evidence before the respondents was sufficient to support the findings of fact and that respondents' findings support the order of revocation.

*We will consider first the counts charging violations of section 25601,* which declares that every "licensee, or agent or employee of a licensee" is guilty of a misdemeanor "who keeps, permits to be used, or suffers to be used, in conjunction with a licensed premises, any disorderly house or place in which people abide or to which people resort, to the disturbance of the neighborhood, or in which people abide or to which people resort for purposes which are injurious to the public morals, health, convenience, or safety." Violation thereof is "the violation or the causing or the permitting of a violation by a licensee of *this division* [div. 9, Bus. and Prof. Code]" [in the predecessor statute it read *"of this act"*] and therefore is cause for revocation of license. (§ 24200, subd. (b).)

██ The cumulative effect of certain of the evidence convinces us that the findings of violations of section 25601 are "supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).) That evidence consists of the testimony of eye witnesses, two members of the Oakland police department and seven officers of the State Department of Alcoholic Beverage Control. They visited the licensed premises and observed what took place. Their several visits were made on April 23 and 30, May 1, 6, 24,

---

pressly finding that subsequent to September 7 up to and including November 27, 1955, the portion of the licensed premises where alcoholic beverages were sold "was a resort for sexual perverts." This, in turn, is followed by "Count IV" declaring that each and all of the findings of fact set forth in Counts I, II and III are incorporated by reference and that by reason of said facts the continuance of the license would be contrary to public welfare and morals and that said facts constitute grounds for the suspension or revocation of the license pursuant to section 24200, subdivision (a) of the Alcoholic Beverage Contral Act and section 22 of article XX of the state Constitution.

Under the head of determination of issues presented, the decision declares, in reference to the several counts by number, the following: Count I, licensee violated section 25601; Count II, licensee violated section 25601; Count III, grounds constituting basis for suspension or revocation under section 24200, subdivision (e); Count IV, continuance of license would be contrary to public welfare and morals, a basis for suspension or revocation under section 24200, subdivision (a); furthermore, with reference to charges set forth in Counts I, II, III, continuance of the license would be contrary to public welfare and morals as said terms are used in section 22 of article XX of the state Constitution.

25, 27, 28, 29, and November 18, 19, 25, 26 and 27, 1955. A brief summary of the salient features of their testimony will serve to indicate its sufficiency.

Dancing occurred in the rear portion of the premises. By far the greater number of couples were men dancing with men and women with women. There were very few mixed couples.[2] Some of the male couples danced cheek to cheek in close embrace. There were numerous incidents of male couples kissing one another. Some danced with their legs intertwined. In many instances both arms were wrapped around the partner's buttocks with loins pressed tightly against each other. Occasionaly, a couple would stop dancing and engage in gyrations of the body with each partner's loins rubbing against the other partner's loins.

On May 28 or 29 one woman was observed sitting on another woman's lap. The latter had her hand on the other's thigh near her privates and was rubbing her hand up and down. On November 19 a similar incident occurred with two other women. On the same evening a mixed couple was observed fondling each other's genitals. April 23, a male couple was observed sitting on a bar stool tandem fashion, the one in the rear embracing the other and caressing his thigh. On May 27 a male couple seated at a table or booth were observed kissing and embracing for some 18 minutes; one of them placed a jacket on his lap and the other inserted a hand under the jacket in the vicinity of the privates and rotated his hand in a rubbing fashion. There were two incidents of a male grabbing the genitals of another male (May and November). In April an employee was seen grabbing one of the dancers in the buttocks and the dancer called the employee a vile name; also, the licensee goosed one of the entertainers and the entertainer said to the licensee "Are you inclined toward Lesbianism?" In November one male couple declared that they had been married some three months and displayed their wedding rings.

One officer testified that on November 18 he observed two dozen male couples dancing. While he was standing with his back to the wall a male patron moved directly in front of him and slowly backed up until he was pressing the witness against the wall and then began to rub his buttocks against the witness' groin and lower abdominal area with a circular and

---

[2] Unless otherwise indicated the events recited in this summary occurred both before and after September 7, 1955, according to the officers' testimony.

up and down motion. Later, when the witness was at the bar, the same person came up behind the witness and began to rub his groin against the witness' buttocks with an up and down motion. This officer also observed that the door to the men's room was left open and any man using the urinals would be visible to most of the people entering the rear room of the place.

On May 29 one male couple seated at a table was observed embracing, hugging and kissing. The younger of the two, 17 years of age, testified that he sat down to watch the floor show and another male patron kissed him on the cheek and then on the mouth and "asked me if I wanted to go with him."

■ There is evidence that such conduct was readily observable by the licensee and her agents, that much of it was observed by them, and that they took no measures to prevent or curb it. The evidence also supports an inference that these were not mere isolated, occasional, unexpected, unpreventable and uncontrollable incidents as the licensee would have us hold.

*The same evidence supports revocation of the license upon the ground that "continuance of . . . [the] license would be contrary to public welfare or morals."* (Bus. and Prof. Code, § 24200, subd. (a).) No further elaboration of the facts in evidence seems necessary.

■ *Does the evidence support the finding and determination that* between September 7 and November 27, 1955, *the portion of the premises where the sale of liquor is permitted was "a resort for . . . sexual perverts,"* in violation of section 24200, subdivision (e), of the Business and Professions Code?

We entertain no doubt that it does. It amply warrants inferences that the place is customarily and regularly used by persons who are prone to and do engage in aberrant sexual conduct to the extent of qualifying as "sex perverts" under the statute, and that they use this public place as a haunt or gathering place for mutual stimulation of their sexually aberrant urges and a place of assignation for the renewal of old and the making of new associations looking toward the consummation of those urges.[3]

---

[3] The licensee claims reversible error in the admission of testimony tending to show that this place has the reputation of being a resort for sexual perverts. We deem it unnecessary to consider that question. The conduct and the events portrayed by the eye-witness testimony is too cogent and convincing to make the cause reversible even if the reputation testimony were erroneously admitted, as to which we express no opinion.

■ The licensee claims that the provisions of subdivision (e) of section 24200 of the Business and Professions Code are too indefinite and uncertain to be constitutional. She says the term "sex pervert" is too vague to be meaningful and that it in turn infects the whole clause with the same weakness and ineffectiveness. We do not so view it. One of the meanings of "perversion" given in Webster's New Collegiate Dictionary (2d ed.) is: ". . . 2. *Psychopathol.* A maladjustment of the sexual life, such that satisfaction is sought in aberrant ways." Seeking and obtaining sexual satisfaction with a person of the same sex is considered an aberrant method by the great majority of people. The methods of copulation available to two persons of the same sex would certainly be so regarded. No more precise definition is necessary for the purposes of this case.

The standard required by the Constitution for criminal statutes was recently stated by the United States Supreme Court in *Roth* v. *United States, Alberts* v. *California,* 354 U.S. 476 [77 S.Ct. 1304, 1312-1313, 1 L.Ed.2d 1498], in a discussion of a statute prohibiting distribution of "obscene or indecent" matter: " '. . . [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices . . . .' *United States* v. *Petrillo,* 332 U.S. 1, 7-8 [67 S.Ct. 1538, 91 L.Ed. 1877, 1883]. These words, applied according to the proper standard for judging obscenity . . . give adequate warning of the conduct proscribed and mark '. . . boundaries sufficiently distinct for judges and juries fairly to administer the law. . . . That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. . . .' "

The Roth and Alberts cases involved situations closer to the one in the instant case than the case cited by the appellant, *People* v. *Building Maintenance etc. Assn.,* 41 Cal.2d 719, 724-725 [264 P.2d 31], where an exemption of agreements, combinations, or associations designed to conduct operations at a *reasonable profit* rendered the whole statute without a fixed standard of guilt. "Obscenity" and "sex pervert" have a core of meaning to the average person. Homosexual activity, to the extent indicated by the patrons of the licensee's bar, is within the general meaning of sexual perversion. That there

may be borderline situations about which opinion may be divided should not vitiate the statute. *People* v. *Building Maintenance etc. Assn., supra,* involved a statute which itself described only a borderline situation.

It is not necessary, under the circumstances of this case, that we seek to ascertain and mark with precision the extreme outer limits of the meaning of the expression ''sex perverts''; and then to read the statute as if it prohibited any liquor licensee from suffering any portion of the premises to be patronized by sex perverts no matter how orderly their conduct or circumspect their behavior while in attendance. That is but one of a number of hypothetical situations that might be conjured up. ''The answer is that those situations are not here involved and the petitioner is limited in its attack to the factual situation now before this court. (*Max Factor & Co.* v. *Kunsman,* 5 Cal.2d 446, 468 [55 P.2d 177] ; *Wholesale Tobacco Dealers Bureau* v. *National etc. Co.,* 11 Cal.2d 634, 661 [82 P.2d 3, 118 A.L.R. 486] ; *Ferrente* v. *Fish & Game Com.,* 29 Cal.2d 365, 373 [175 P.2d 222] ; *People* v. *Bowlin,* 19 Cal.App. 2d 397, 399-400 [65 P.2d 840] ; *Estate of Monks,* 48 Cal.App. 2d 603, 614 [120 P.2d 167].)'' (*City & County of San Francisco* v. *Industrial Acc. Com.,* 142 Cal.App.2d 494, 501 [298 P.2d 651].)

As a part of her argument in this connection the licensee points to the ruling in *Stoumen* v. *Reilly,* 37 Cal.2d 713 [234 P.2d 969], to the effect that evidence that a restaurant was reputed to be a ''hangout'' for homosexuals indicated merely that it was a meeting place for such persons, which might be for purely social and harmless purposes, such as the consumption of food and drink, not in itself a violation of former section 58 of the Alcoholic Beverage Control Act (now Bus. & Prof. Code, § 25601) nor ''contrary to public welfare or morals'' (Const., art. XX, § 22). She then asks us to conclude that the Legislature sought to overturn that judicial principle and make the holding of such a meeting cause for revocation when it added subdivision (e) to section 24200 in 1955.

We do not feel compelled to infer any such legislative intent. It would seem a fair inference to conclude that in making that amendment the Legislature acted in the light of and consistently with the rule of the Stoumen case, by inference excluding from the coverage of subdivision (e) the type of conduct which the Supreme Court had declared harmless and not inimical to public welfare or morals. The court having so recently and with such clarity said it, why should the Legis-

lature say it again? However, as we have indicated, that is a hypothetical situation not presented by the facts of this case. It involves a question that need not be and is not decided at this time.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.