[Civ. No. 18014. First Dist., Div. One. July 31, 1958.]

HAZEL NICKOLA, Appellant, v. RUSSELL S. MUNRO, as Director of the Department of Alcoholic Beverage Control, Respondent.

John A. Putkey for Appellant.

Edmund G. Brown, Attorney General, and Charles A. Barrett, Deputy Attorney General, for Respondent.

PETERS, P. J.—Petitioner-appellant, Hazel Nickola, holds an on-sale general liquor license, and operates a tavern in San Mateo County. She was accused of violating subsections 25658, subdivisions (a) and (b),* and subsections 24200, subdivisions (b) and (e)† of the Business and Professions Code.

Count one of the accusation charges that: "On or about February 18, 1956 and for some time prior thereto, on that portion of the premises upon which alcoholic beverages were sold the above-named licensee permitted the above-described licensed premises to become and remain a resort for sexual perverts."

Count two charges that on February 17, 1956, the licensee sold and furnished an alcoholic beverage to one Grant Dailey, a minor.

---

*§ 25658, subds. (a) and (b) relate to the sale to and purchase of liquor by a minor.

†§ 24200 provides the grounds for suspension or revocation of licenses. Subdivision (b) is a general provision. Subdivision (e) was added to the section in 1955 (Stats. 1955, p. 2230, chap. 1217). It provides: "(e) Where the portion of the premises of the licensee upon which the activities permitted by the license are conducted are a resort for illegal possessors or users of narcotics, prostitutes, pimps, panderers, or sexual perverts. In addition to any other legally competent evidence, the character of the premises may be proved by the general reputation of the premises in the community as a resort for illegal possessors or users of narcotics, prostitutes, pimps, panderers, or sexual perverts."

The accusation here involved was filed March 13, 1956.

The Department of Alcoholic Beverage Control adopted the recommendations of its hearing officer, who had found the allegations of the accusation to be true, and recommended that the license involved be revoked for the violation set forth in Count One and that it be suspended for 15 days for the violation set forth in Count Two. The Appeals Board affirmed the Department decision. The superior court found that the departmental decisions were proper, that the evidence supported the findings, and entered its judgment denying the petition for a writ of mandate. The licensee appeals.

██ The facts as developed at the hearing amply support the challenged findings. The licensee has operated the tavern in question since 1939. Following the war, and particularly in 1954 and 1955 business declined, but in January of 1956 and until February 19th of that year there was a marked increase. In the latter part of November and early in December, 1955, representatives of the San Mateo County Sheriff's office warned the licensee that some of the activities taking place in the tavern should be discontinued. Between January 7, 1956, and February 18th of that year various agents of the Department of Alcoholic Beverage Control and members of the sheriff's office, singly and in groups, visited the tavern on at least seven different occasions. On these visits there were between 100 and 250 patrons in the establishment, over 90 per cent male. Most of the patrons were young men in their twenties, and many of them were under 21. The licensee was present in the tavern during most of these visits. The representatives of the law testified that they observed the same people present on several different occasions. There was almost continuous dancing taking place during these visits. The vast majority of dancers were men dancing with other men in close and affectionate embrace. Many of the men had their arms wrapped around each other's waists, or shoulders, or buttocks. Many men were observed kissing or fondling or biting each other, or holding hands, and other men were seen sitting on the laps of their male companions and kissing and fondling each other. The few female patrons were dressed in mannish attire, and most of them danced with each other. Some of the male dancers, while dancing, wrapped their arms around the buttocks of their companions and vigorously rotated their pelvic areas, to the evident enjoyment of other patrons. Men were seen powdering their faces, talking in effeminate voices, and generally acting like over-affectionate females. Two of the agents were solicited to dance

by a male patron who was called Ramona. On one occasion a Filipino male and a white male were observed standing with their arms encircling each other's shoulders. The white patron kissed the Filipino while the latter nestled his head into the shoulder of his companion. Frequent cases of men inserting their fingers into the buttocks areas of their companions were observed. One agent saw a young man place his hand in the crotch area of three men as the young man passed them. Another agent saw a male patron fondle the private parts of a Negro patron for a period of several seconds. Other evidence could be referred to, but the above summary is illustrative of the type of activity observed in the tavern over a rather lengthy period. Although the licensee and her employees were present while these various activities were openly going on, no one remonstrated or attempted to stop them.

The sheriff testified that the tavern had a general reputation in the county as a place where homosexuals were gathering for dancing and entertainment, and a place catering to sexual perverts. This testimony was corroborated by various people who live near the tavern who testified that it had a reputation of being patronized by sexual deviates, or homosexuals, or being a hangout for degenerates and undesirables.

The defense did not contradict much of this evidence. A special officer employed by the tavern for five days in February, 1956, testified that when he was first employed the licensee told him that the place was "gay." While he denied seeing male patrons fondle each other, he saw men dancing with men in close embrace, and did see men biting each other. He was never told to throw such people out, and did not do so. Several employees of the tavern, while denying seeing any fondling of private parts, or kissing, admitted that men frequently danced with men in close embrace, and women with women, and admitted knowing that the establishment had a reputation for catering to homosexuals.

Sheriff Whitmore of San Mateo County conducted a raid on the tavern on February 19, 1956. Of the 225 patrons then present, 78 men, 10 women and 2 juveniles were arrested. On the way to the jail the licensee was asked if she knew that her customers were sexual perverts. She replied that she did know that fact, and that she also knew that men were dancing with men, and women with women on the premises. Among the persons arrested were two men who had been convicted of violations of section 288a of the Penal Code—oral copulation—

and one who had been convicted of being a lewd and dissolute person. There was no evidence, however, that the licensee knew of these convictions.

The licensee testified that men began to dance with men in her tavern about the first of 1956, and the real crowds began coming to the tavern shortly after February 1, 1956. She admitted telling the special officer hired by her that the place was "gay," but by this she simply meant that it was a hilarious, jovial crowd. She did not observe any kissing, or embracing of men by men and did not see anyone fondle the privates of another. She admitted she had heard rumors in January that her place was becoming a hangout for homosexuals.

On the second count, Grant Dailey, a high school student who was 19 years and 7 months of age, testified that he visited the premises on the evening of February 17, 1956, in the company of an adult friend. He had heard that the tavern was "an exceedingly unusual place" because "frequented by a certain type of people" who were "exceedingly informal" and who were "a certain type of intellectual." During the evening he was served a cognac by "mistake." His friend, an adult, ordered a drink, and he ordered a Calso. The waitress misunderstood and brought a cognac, or "At least I got a cognac." He stated "I received a cognac from the waitress," and that he paid for a cognac. He partly consumed the cognac. There were 6 or 8 people at his table and the waitress placed the tray with the drinks on the table and when they were passed around he got a cognac. He returned to the tavern on February 18th and was taken into custody when the place was raided in the early morning hours of February 19th.

The hearing officer, on this evidence, found that it was true that the licensee "permitted the above-described licensed premises to become and remain a resort for sexual perverts," determined that this was a violation of section 24200, subdivision (e) of the Business and Professions Code and of article XX, section 22, of the state Constitution, and recommended a revocation of the license. On the second count, he found that the licensee had furnished liquor to a minor, and recommended a 15-day suspension. This proposed decision was adopted by the Department of Alcoholic Beverage Control and affirmed by the Appeals Board. The superior court affirmed the recommendations, and denied the petition for a writ of mandate.

Section 24200, subdivision (e) of the Business and Professions Code as enacted in 1955 provides that it is a ground of suspension or revocation of a license if the licensed premises are conducted as a "resort for illegal possessors or users of narcotics, prostitutes, pimps, panderers, or sexual perverts." Article XX, section 22, of the Constitution empowers the Department of Alcoholic Control to suspend or revoke a license if it shall determine for good cause that the continuance of the license "would be contrary to public welfare or morals."

The main contentions of the licensee are that the finding that she permitted the tavern to be conducted as a "resort" for "sexual perverts" is unsupported by the evidence, and that if the evidence be interpreted as showing a violation of the section, then the section is unconstitutional.

The general problem involved is not new. It came before the Supreme Court in 1951, before section 24200, subdivision (e) was enacted, in the case of *Stoumen* v. *Reilly*, 37 Cal.2d 713 [234 P.2d 969]. There the licensee was charged with permitting the licensed premises to be used as a disorderly house for purposes injurious to public morals. The evidence showed that, to the knowledge of the licensee, the premises were patronized by persons of homosexual tendencies who used the tavern as a meeting place. There was no evidence of any immoral or illegal or improper conduct on the premises. The court held that the then provisions of the law required that some improper conduct take place on the premises before a violation could be found, and that the then statute did not attempt to regulate mere patronage. The court pointed out that adult members of the public have a right to patronize a bar (p. 716) "so long as they are acting properly and are not committing illegal or immoral acts," and that the proprietor has no right to exclude such persons except for good cause. The court held that homosexuals had the legal right to patronize a bar and that (p. 716) "mere proof of patronage, without proof of the commission of illegal or immoral acts on the premises, or resort thereto for such purposes" was not sufficient to show a violation of the then law. The mere fact that the bar was reputed to be a meeting place for homosexuals, said the court, does not imply that the premises were being used for an improper purpose. The court also held that the suspension of the license could not be justified under article XX, section 22 of the Constitution, which also necessarily required improper conduct as a basis for the suspension.

Then in 1955 section 24200, subdivision (e), was added to the Business and Professions Code. That section, as already pointed out, permits suspension or revocation if the licensee permits the premises to be used as a "resort for . . . sexual perverts." We think that, before a licensee can be disciplined under this section, the licensee must have actual knowledge that his premises are being used for such purposes, or must know facts that to a reasonable person would indicate that such was the fact. The usual and normal way that the tavern operator would or should know such fact is by the patrons engaging in such conduct on the premises that a reasonable man would know that the premises are being used as a "resort for . . . sexual perverts." We do not think that section 24200, subdivision (e), was passed by the Legislature to repeal or to change the rule of the Stoumen case to the effect that improper or illegal or immoral conduct must occur on the premises before discipline of the licensee is permitted, but was passed with the Stoumen case in mind to clarify the rule of that case. This was the precise holding of this court in *Kershaw* v. *Department of Alcoholic Beverage Control*, 155 Cal.App.2d 544 [318 P.2d 494], decided in 1957. There the licensee was charged with allowing the licensed premises to be used in violation of the disorderly house statute involved in the Stoumen case, and as a "resort for . . . sexual perverts" in violation of section 24200, subdivision (e) of the Business and Professions Code. The evidence showed the commission of improper and immoral acts of the same general type as are here involved. This court stated (p. 548) : "There is evidence that such conduct was readily observable by the licensee and her agents, that much of it was observed by them, and that they took no measures to prevent or curb it. The evidence also supports an inference that these were not mere isolated, occasional, unexpected, unpreventable and uncontrollable incidents."

With specific reference to section 24200, subdivision (e), this court stated that the evidence (p. 548) "warrants inferences that the place is customarily and regularly used by persons who are prone to and do engage in aberrant sexual conduct to the extent of qualifying as 'sex perverts' under the statute, and that they use this public place as a haunt or gathering place for mutual stimulation of their sexually aberrant urges and a place of assignation for the renewal of old and the making of new associations looking toward the consum-

*mation of those urges.''* This language aptly describes the situation here involved.

In the Kershaw opinion the court also held that the words ''sex pervert'' used in the section were not so vague, indefinite and uncertain as to render the section unenforceable. The court first quoted the definition of ''perversion'' in Webster's New Collegiate Dictionary (2d ed.) as (p. 549): ''A maladjustment of the sexual life, such that satisfaction is sought in aberrant ways,'' and then held that ''Seeking and obtaining sexual satisfaction with a person of the same sex is considered an aberrant method by the great majority of people. . . . No more precise definition is necessary for the purposes of this case.'' The court quite properly refused to fix the outermost limits of the terms, stating (p. 549): '' 'Obscenity' and 'sex pervert' have a core of meaning to the average person. Homosexual activity, to the extent indicated by the patrons of the licensee's bar, is within the general meaning of sexual perversion. That there may be borderline situations about which opinion may be divided should not vitiate the statute. . . .

''It is not necessary, under the circumstances of this case, that we seek to ascertain and mark with precision the extreme outer limits of the meaning of the expression 'sex perverts'; and then to read the statute as if it prohibited any liquor licensee from suffering any portion of the premises to be patronized by sex perverts no matter how orderly their conduct or circumspect their behavior while in attendance. That is but one of a number of hypothetical situations that might be conjured up. 'The answer is that those situations are not here involved and the petition is limited in its attack to the factual situation before this court. [Citing many cases.]' ''

In reference to the argument that section 24200, subdivision (e), was intended to overturn the principles announced in the Stoumen case, this court stated (p. 550): ''We do not feel compelled to infer any such legislative intent. It would seem a fair inference to conclude that in making that amendment the Legislature acted in the light of and consistently with the rule of the Stoumen case, by inference excluding from the coverage of subdivision (e) the type of conduct which the Supreme Court had declared harmless and not inimical to public welfare or morals. The court having so recently and with such clarity said it, why should the Legislature say it again?''

The Kershaw case is on all fours with the instant one. The contention that the words ''sex pervert'' must be limited to

one who commits perverted acts in violation of the Penal Code, such as sodomy or oral copulation, is without merit. This argument was disposed of adversely to appellant in the Kershaw case. ■ To what was there said we add that when one male, by acts of the type here involved, seeks sexual gratification from another in a public tavern, he has committed acts of sex perversion and demonstrated that he is a sex pervert. We do not find it necessary to discuss the psychological aspects of homosexuality or to determine the outermost limits of homosexual conduct that amounts to sex perversion. ■ All that we have to determine in this case is that the conduct here involved supports the finding that many of the patrons of this tavern, to the knowledge of the licensee, committed acts that should have informed the licensee that they were sex perverts, and that the acts amounted to sex perversion. The fact, if it be a fact, that these acts may not have been punishable under the Penal Code is immaterial. Seeking sexual satisfaction in the manner here described in a public tavern offends the moral sense of the general public. There are many things that can be done in the privacy of the home which may not be illegal, but if done in a public tavern are directly offensive to public morals and decency, and demonstrate that the participants are sex perverts. The continuance of the license under such circumstances "would be contrary to public welfare or morals" as provided in our Constitution. That is the type of conduct here involved. Further than that we do not have to go.

■ We hold that the statute as construed herein is constitutional and that the evidence is sufficient to support the finding that the licensee violated its terms.

■ It is equally clear that there is substantial evidence to support the finding that the licensee sold or furnished an alcoholic beverage to a minor. The mere fact that the minor testified he ordered Calso and was served a cognac through a misunderstanding is no defense. The waitress placed the drink on the table and it was handed to the minor. This is sufficient. The pertinent statute specifies that it is an offense to cause an alcoholic beverage to be furnished or given to a minor. That statute was here violated.

The judgment is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 24, 1958.