ONE ELEVEN WINES & LIQUORS, INC., A NEW JERSEY
CORPORATION, APPELLANT, v. DIVISION OF ALCO-
HOLIC BEVERAGE CONTROL AND JOSEPH P. LORDI,
DIRECTOR, ETC., RESPONDENTS.

VAL'S BAR, INC., A NEW JERSEY CORPORATION, APPEL-
LANT, v. DIVISION OF ALCOHOLIC BEVERAGE CON-
TROL AND JOSEPH P. LORDI, DIRECTOR, ETC., RE-
SPONDENTS.

MURPHY'S TAVERN, INC., APPELLANT, v. DIVISION OF
ALCOHOLIC BEVERAGE CONTROL, RESPONDENT.

Argued September 11 and 12, 1967—Decided November 6, 1967.

*Mr. Theodore Sager Meth* argued for appellant One
Eleven Wines & Liquors, Inc. (*Messrs. Busch & Busch,* at-
torneys).

*Mr. Norman A. Oshlry* of the Pennsylvania Bar argued for appellant Val's Bar, Inc. (*Messrs. Jacobson & Silverman,* attorneys).

*Mr. Louis R. Cerefice* argued for appellant Murphy's Tavern, Inc.

*Mr. Stephen Skillman,* Deputy Attorney General, argued for respondents Division of Alcoholic Beverage Control and Joseph P. Lordi, Director, etc. (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Richard Newman* and *Mr. Michael Rudolph,* Deputy Attorneys General, on the brief).

*Mr. Avrom J. Gold,* attorney for F. & A. Corporation, and *Messrs. Diamond and Pitman,* attorneys for The Mattachine Society, Inc., filed briefs *amicus curiae.*

The opinion of the court was delivered by

Jacobs, J. The Division of Alcoholic Beverage Control disciplined the appellants for permitting apparent homosexuals to congregate at their licensed premises. It suspended the licenses of One Eleven Wines & Liquors, Inc. and Val's Bar, Inc. and revoked the license of Murphy's Tavern, Inc. On One Eleven's appeal to the Appellate Division the suspension of its license was sustained under the authority of *Paddock Bar, Inc. v. Alcoholic Beverage Control Div'n,* 46 *N. J. Super.* 405 (*App. Div.* 1957) and *Murphy's Tavern, Inc. v. Davis,* 70 *N. J. Super.* 87 (*App. Div.* 1961). We granted certification on the licensee's application. 48 *N. J.* 349 (1966). We also certified, on our own motion, the appeals which had been duly taken to the Appellate Division by Val's Bar and Murphy's Tavern and were awaiting argument there. *R. R.* 1:10–1.

The disastrous experiences of national prohibition led to the adoption of the twenty-first amendment and to the

return of liquor control to the states in 1933. See *Grand Union Co. v. Sills,* 43 *N. J.* 390, 399 (1964). When our Legislature during that year first created the Department of Alcoholic Beverage Control, it vested broad regulatory powers in a state commissioner who immediately set about to insure that abuses which had originally contributed so heavily in bringing about national prohibition, would not be permitted to recur. He adopted stringent regulations which he rigidly enforced and which the courts supported with great liberality. See *Franklin Stores Co. v. Burnett,* 120 *N. J. L.* 596 (*Sup. Ct.* 1938); *Gaine v. Burnett,* 122 *N. J. L.* 39 (*Sup. Ct.* 1939). He concerned himself not alone with matters of lawfulness but also with matters of public sensitivity for he firmly believed that the effectiveness of the new mode of control would turn on the extent of the public's acceptance of the manner in which licensed establishments were conducted. Here again the courts sustained his pertinent regulatory actions with broad sweep. See *McFadden's Lounge v. Div. of Alcoholic Bev. Control,* 33 *N. J. Super.* 61 (*App. Div.* 1954); *Paddock Bar, Inc. v. Alcoholic Beverage Control Div'n, supra,* 46 *N. J. Super.* 405.

Among the commissioner's early regulations were Rules 4 and 5 which were adopted in 1934. Rule 4 provided that no licensee shall allow in the licensed premises "any known criminals, gangsters, racketeers, pick-pockets, swindlers, confidence men, prostitutes, female impersonators, or other persons of ill repute." And Rule 5 provided that no licensee shall allow "any disturbances, brawls, or unnecessary noises" or allow the place of business to be conducted "in such manner as to become a nuisance." In 1936 Rule 5 was revised to include an express prohibition of "lewdness" and "immoral activities," and in 1950 it was again revised to include an express prohibition of "foul, filthy, indecent or obscene language or conduct." See *McFadden's Lounge v. Div. of Alcoholic Bev. Control, supra,* 33 *N. J. Super.,* at *p.* 64; *Jeanne's Enterprises, Inc. v. State of N. J., etc.,* 93 *N. J. Super.* 230 (*App. Div.*), affirmed, 48 *N. J.* 359 (1966).

During the years prior to 1954 the department instituted proceedings under Rule 4 on the basis of evidence that apparent homosexuals had been permitted to congregate at the licensed premises. Apparently the department considered that the effeminate manifestations of the patrons brought them within the prohibition of "female impersonators" although that term relates more properly to transvestites who are, for the most part said to be non-homosexuals. In *Re M. Potter, Inc.*, A. B. C. Bulletin 474, Item 1 (August 7, 1941) the investigators had observed a group of male patrons, "whose voices, gestures and actions were effeminate," dancing and kissing among themselves. Although there was an express finding that "no actual acts of immorality" were committed at the licensed premises, the license was nonetheless suspended. In the course of his formal opinion, the acting commissioner said that the mere "presence of female impersonators in and upon licensed premises presents a definite social problem"; and in line with the then widespread intolerance and limited public understanding of the subject, he made reference to "the deep-rooted personal contempt felt by a normal red-blooded man" and to the notion that "the mere thought of such perverts is repugnant to the normal person."

Since 1954 and despite increasing public tolerance and understanding, departmental proceedings aimed at the congregation of apparent homosexuals have continued apace but have been brought under Rule 5 rather than Rule 4. They have not been based on any specific and individualized charges of lewd or immoral conduct but rather on general charges that by permitting the apparent homosexuals to congregate, the licensees had allowed their places of business to be conducted in such manner "as to become a nuisance" within the contemplation of Rule 5. In *Re Polka Club, Inc.*, A. B. C. Bulletin 1045, Item 6 (December 27, 1954) the then director, in suspending a license on a charge of violation of Rule 5, said that he would not permit licensed premises to become "havens for deviates." In *Re Kaczka and Trobiano*,

A. B. C. Bulletin 1063, Item 1 (April 21, 1955) the licensee introduced expert testimony that homosexuality is not contagious and that seeing groups of homosexuals would not affect normal people but the license was nonetheless suspended. As illustrated in many of his rulings, including *Re Louise G. Mack,* A. B. C. Bulletin 1088, Item 2 (November 2, 1955), the director entertained the view that since exposure to homosexuals might be harmful to *"some* members of the public" the congregating of homosexuals must be prohibited as a "threat to the safety and morals of the public." See *Paddock Bar, Inc. v. Alcoholic Beverage Control Div'n, supra,* 46 *N. J. Super.,* at *p.* 408.

In the very cases before us the Division of Alcoholic Beverage Control made it clear that it has not in anywise moderated its long standing position that permitting the congregation of apparent homosexuals, without more, is violative of Rule 5. The evidence against Murphy's Tavern disclosed many individual acts which could have been the basis of specified and individualized charges of lewd or immoral conduct at the licensed premises. But no such charges were preferred and when, during the course of cross-examination, one of the division's investigators was asked whether he had observed any lewdness at Murphy's Tavern, the prosecuting attorney pointed out that the division had not alleged "any immoral activity or lewdness itself" but had simply alleged that the licensee had "permitted the licensed place of business to become a nuisance" in that it had allowed "these persons to come in and congregate upon the premises."

In the *One Eleven* proceeding there was no charge and no substantial evidence that lewd or immoral conduct was permitted at the licensed premises. There was a charge and sufficient evidence that the licensee had permitted apparent homosexuals to congregate there. Investigators had visited the premises on several occasions and had observed the patrons; the testimony included the following partial account of their behavior:

They were conversing and some of them in a lisping tone of voice, and during certain parts of their conversations they used limp-wrist movements to each other. One man would stick his tongue out at another and they would laugh and they would giggle. They were very, very chummy and close. When they drank their drinks, they extended their pinkies in a very dainty manner. They took short sips from their straws; took them quite a long time to finish their drink. * * *

They were very, very endearing to one another, very, very delicate to each other. * * *

They looked in each other's eyes when they conversed. They spoke in low tones like an effeminate male. When walking, getting up from the stools, they very politely excused each other, hold on to the arm and swish and sway down to the other end of the bar and come back. * * *

Their actions and mannerisms and demeanor appeared to me to be males impersonating females, they appeared to be homosexuals commonly known as queers, fags, fruits and other names.

Similarly in the proceeding against Val's Bar there was no charge nor any substantial evidence at the hearing before the director that lewd or immoral conduct was permitted at the licensed premises. Investigators had visited the premises on several occasions and testified in detail as to the behavioral characteristics which led them to the permissible conclusion that the patrons were apparent homosexuals. See 7 *Wigmore, Evidence* § 1974 (3d ed. 1940); Tyree, *The Opinion Rule,* 10 Rutgers L. Rev. 601 (1956); cf. *State v. Campisi,* 23 N. J. 513, 520 (1957); *State v. Guerrido,* 60 N. J. Super. 505, 511 (*App. Div.* 1960). The investigators acknowledged that for the most part the patrons were "normally dressed" and showed "very good behavior." Dr. Wardell B. Pomeroy, called as an expert witness by the licensee, testified that, although it could not be said from mere observation that any given individual was a homosexual, he would be of the opininon that tavern patrons with the characteristics described by the investigators were apparent homosexuals.

Dr. Pomeroy was associated with the Kinsey Institute for twenty years and was the co-author of several books dealing with sexual behavior and offenses. He referred to the Kinsey

studies which contained startling indications that 13% of the males in the country were "more homosexual than heterosexual" and that 37% had "at least one homosexual experience to the point of orgasm in the course of their life." He also referred to indications that 55% of the population was neutral on the subject of homosexuality and there is now "a more acceptance attitude" than there was twenty years ago. See Mosk, *Forward* to *The Consenting Adult Homosexuals and the Law,* 13 U. C. L. A. L. Rev. 644, 645 (1966). In response to an inquiry by the division's hearer, Dr. Pomeroy voiced the opinion that no adverse social effects would result from permitting homosexuals to congregate in licensed establishments. He noted that non-homosexuals would not be harmed by being in the same premises with homosexuals, and that any who found their mere presence to be offensive would presumably leave. He expressed the view that permitting their congregation in taverns would tend to eliminate clandestine associations in unregulated and unsupervised places of public nature. See *Cory and Le Roy, The Homosexual and His Society* 119, 121 (1963); see also *Schur, Crimes Without Victims* 86, 87 (1965) where Dr. Schur dealt with the so-called "gay" bars operating in our neighboring states and elsewhere:

"Although such establishments are sometimes condemned as breeding grounds of homosexuality, the charge is not convincing. Most of the people who go there (apart from tourists and some 'straight' friends) already are involved in the homosexual life. Anyone who wanders in and who is offended by what he sees is perfectly free to leave. The authors of a recent 'view from within' emphasize that although an increase in homosexuality may increase the demand for homosexual bars, the bars can scarcely be said to produce homosexuals. Indeed, as these writers go on to suggest, the bars serve to keep homosexuals 'in their place'—out of more public places and, to a certain extent, beyond the public view."*

---

* The authors referred to by Dr. Schur are Cory and LeRoy who at pages 121–122 of their book entitled *The Homosexual and His Society* had this to say:

"It can be argued that gay bars spread homosexuality and the elimination of them will help arrest this development. However, peo-

The views expressed by Doctors Pomeroy and Schur find significant legal support in various judicial holdings, notably those of the California Supreme Court. In *Stoumen v. Reilly*, 37 *Cal. 2d* 713, 234 *P. 2d* 969 (1951) the license was suspended because the licensee had permitted "persons of known homosexual tendencies" to patronize and meet at the licensed premises. Under Section 58 of the California Alcoholic Beverage Control Act, it was unlawful to permit the licensed premises to be conducted as a disorderly house or as a place "to which people resort for purposes which are injurious to the public morals, health, convenience or safety." The court, in setting aside the suspension, held that mere patronage "without proof of the commission of illegal or immoral acts on the premises, or resort thereto for such purposes" was not sufficient to show a violation of Section 58. Elsewhere in its opinion it stressed that in order to establish "good cause" for suspension of the license, something more must be shown than that many of the patrons were homosexuals and used the premises "as a meeting place." 234 *P. 2d*, at *p.* 971.

After the *Stoumen* case was decided, the California Legislature enacted the provision in section 24200, subdivision (e) of the Business and Professions Code under which licensed premises were prohibited from being used as resorts for "sexual perverts." In *Vallerga v. Dept. of Alcoholic Beverage Con.*, 53 *Cal. 2d* 313, 1 *Cal. Rptr.* 494, 347 *P. 2d* 909 (1959) a license was revoked because the licensee had permitted his premises to become a resort for homosexuals. The revocation was set aside by the California Supreme Court which held that the legislative provision was uncon-

ple who argue this way usually have little or no understanding of the problem and know very little about such bars. Most of those who go to gay bars are already homosexual and those who are not have no interest in remaining in these places for long, and seldom return. It is difficult to imagine a person walking into a gay bar and becoming homosexual, if he had not already been favorably disposed to such activity."

stitutional under *Stoumen.* The court also considered the contention that, apart from the provision declared unconstitutional, the revocation could be sustained on the ground that continuance of the license would be "contrary to public welfare and morals" within the lower court holdings in *Nickola v. Munro,* 162 *Cal. App. 2d* 449, 328 *P. 2d* 271 (1958) and *Kershaw v. Department of Alcoholic Beverage Cont.,* 155 *Cal. App. 2d* 544, 318 *P. 2d* 494 (1957); in this connection it said:

"In the Nickola case the court held generally that seeking sexual gratification in a public tavern with another of the same sex would offend the moral sense of the general public. The court stated, 162 Cal. App. 2d at page 457, 328 P. 2d at page 276: 'There are many things that can be done in the privacy of the home which may not be illegal, but if done in a public tavern are directly offensive to public morals and decency, and demonstrate that the participants are sex perverts. The continuance of the license under such circumstances "would be contrary to public welfare or morals" as provided in our Constitution. * * * Further than that we do not have to go.' Conduct which may fall short of aggressive and uninhibited participation in fulfilling the sexual urges of homosexuals, reported in some instances (see Kershaw v. Department of Alcoholic Bev. Control, supra, 155 Cal. App. 2d 544, 547-548, 318 P. 2d 494), may nevertheless offend good morals and decency by displays in public which do no more than manifest such urges. This is not to say that homosexuals might properly be held to a higher degree of moral conduct than are heterosexuals. But any public display which manifests sexual desires, whether they be heterosexual or homosexual in nature may, and historically have been, suppressed and regulated in a moral society." 1 *Cal. Rptr.,* at *p.* 497, 347 *P. 2d,* at *p.* 912.

The court in *Vallerga* was of the opinion that the record before it contained sufficient evidence of overtly offensive acts within the licensed premises upon which specific and individualized charges of conduct "contrary to public welfare or morals" could have been preferred against the licensee. But no such charges had been preferred and the only charge preferred, namely, permitting the premises to become a resort for homosexuals in violation of subdivision (e), was the one held by the court to be constitutionally infirm. The court's setting aside of the revocation was presumably with-

out prejudice to the right to proceed against the licensee on specific and individualized charges and proof of overt acts within the licensed premises offensive to "good morals and decency." See 1 *Cal. Rptr.*, at *pp.* 498–499, 347 *P. 2d*, at *pp.* 913–914; *cf. Sabes v. City of Minneapolis*, 265 *Minn.* 166, 120 *N. W. 2d* 871, 878 (1963).

While the New York cases contain obscurities, many of them seem to take an approach comparable to that taken by the California Supreme Court. Thus in *People v. Arenella*, 139 *N. Y. S. 2d* 186 (*N. Y. C. Mag. Ct.* 1954) the court, in dealing with a criminal charge that a licensee had allowed his premises to become disorderly, differentiated cases deemed disorderly where the premises were frequented by homosexuals in "open and notorious manner, for the purpose of soliciting others to commit lewd and indecent acts" from others, not deemed disorderly, where the evidence established nothing more than that homosexuals patronized the premises without engaging in prohibited acts therein. 139 *N. Y. S. 2d,* at *p.* 189. Similarly in *Kerma Restaurant Corporation v. State Liquor Authority*, 27 *A. D. 2d* 918, 278 *N. Y. S. 2d* 951 (1966) the court, while sustaining the revocation of a license on the basis of solicitation and other overtly offensive acts within the licensed premises, acknowledged that the "mere congregation of homosexuals, where there is no breach of the peace, does not make the premises disorderly" within the meaning of New York's Alcoholic Beverage Control Law. 278 *N. Y. S. 2d*, at *p.* 952. See *In re Farley*, 217 *N. Y.* 105, 111 *N. E.* 479, 481 (1916); *cf. Lynch's Builders Restaurant, Inc. v. O'Connell*, 303 *N. Y.* 408, 103 *N. E. 2d* 531 (1952); *Fulton Bar & Grill, Inc. v. State Liquor Authority*, 11 *A. D. 2d* 771, 205 *N. Y. S. 2d* 37 (1960); *Gilmer v. Hostetter*, 20 *A. D. 2d* 586, 245 *N. Y. S. 2d* 252 (1963).

In *Re Revocation of Licence of Clock Bar, Inc.*, 85 *Dauph.* 125 (*Pa.* 1966) the court sustained a suspension grounded on evidence of improper solicitations by homosexuals at the licensed premises. However, in the course of its opinion it

pointed out there was "no law which forbids homosexuals from being patrons of licensed premises," that the mere, though open, congregation of homosexuals at the licensed premises would not sustain a charge that the licensee maintained "a disorderly house," and that homosexuals at licensed premises become objectionable only "when they make a nuisance of themselves" by improper solicitation or other overtly offensive conduct. 85 *Dauph.* at 131. See *Sesaroni v. Smith,* 202 *A.* 2d 292 (*R. I.* 1964); but cf. *Inman v. City of Miami,* 197 *So.* 2d 50 (*Fla. Dist. Ct. App.* 1967), *petition for certiorari filed,* 36 *U. S. L. W.* 3163 (U. S. Oct. 11, 1967) (No. 717).

Though in our culture homosexuals are indeed unfortunates, their status does not make them criminals or outlaws. *Cf. Robinson v. California,* 370 *U. S.* 660, 82 *S. Ct.* 1417, 8 *L. Ed.* 2d 758 (1962). So long as their public behavior violates no legal proscriptions they have the undoubted right to congregate in public. And so long as their public behavior conforms with currently acceptable standards of decency and morality, they may, at least in the present context, be viewed as having the equal right to congregate within licensed establishments such as taverns, restaurants and the like. See *Stoumen v. Reilly, supra,* 234 *P. 2d,* at *p.* 971. In sustaining the suspension of One Eleven's license, the Appellate Division took the position that it was not concerned with the rights of the patrons since technically the legal issue before it was the validity of Rule 5 under which the license was suspended. But the asserted rights of the homosexuals to assemble in and patronize licensed establishments are intertwined with the asserted rights of licensed establishments to serve them. Surely in these circumstances, the licensees are properly to be viewed as having standing to seek vindication of the various rights involved in order that the Court's ultimate determination may soundly rest on the complete mosaic. *Cf. Griswold v. Connecticut,* 381 *U. S.* 479, 481, 85 *S. Ct.* 1678, 14 *L. Ed.* 2d 510, 512 (1965); *NAACP v. Alabama,* 357 *U. S.* 449, 458, 78 *S. Ct.* 1163,

2 *L. Ed.* 2d 1488, 1497 (1958); *Barrows v. Jackson,* 346 *U. S.* 249, 255, 73 *S. Ct.* 1031, 97 *L. Ed.* 1586, 1594 (1953); *Pierce v. Society of Sisters,* 268 *U. S.* 510, 535, 45 *S. Ct.* 571, 69 *L. Ed.* 1070, 1078 (1925); Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court,* 71 Yale L. J. 599, 626 (1962).

The Division of Alcoholic Beverage Control, stressing the acknowledged constitutional and statutory breadth of its regulatory powers (*Boller Beverages, Inc. v. Davis,* 38 *N. J.* 138, 150 (1962); *Guill v. Mayor and Council of City of Hoboken,* 21 *N. J.* 574 (1956)), contends that the mere congregation of apparent homosexuals in taverns is contrary to the public welfare and may therefore reasonably be prohibited under its wide police powers. *Cf. Jeanne's Enterprises, Inc. v. State of N. J., etc., supra,* 93 *N. J. Super.,* at *p.* 232. It points to the fact that the very term "apparent homosexuals" contemplates effeminate behavioral characteristics, such as those described earlier in this opinion, but apparently it concedes, as it must in the light of the times, that such behavioral characteristics without more, would not constitute overt conduct offensive to current standards of morality and decency. It expresses various fears which we have carefully considered but which lack significant support in the records before us or in the available materials on the subject.

Thus the division suggests that the presence of apparent homosexuals in so-called "gay" bars may serve to harm the occasional non-homosexual patrons who happen to stray there but it produces nothing to rebut the expert testimony or the published writings to the contrary. See *Cory and LeRoy, supra,* at *p.* 121; *Schur, supra,* at *p.* 87. It further suggests that offensive conduct by apparent homosexuals within the licensed premises "may lead to violence" against them by non-homosexuals but this ignores the licensee's comprehensive capacity and responsibility, at the peril of its license, for precluding offensive conduct and for conducting its establishment in lawful and orderly fashion. See *In re Olympic, Inc.,* 49 *N. J. Super.* 299, 305–09 (*App. Div.*), certif. denied, 27

N. J. 279 (1958). Finally, it points out that it has consistently tried "to increase public respect and confidence in the liquor industry" (cf. *X-L Liquors v. Taylor*, 17 *N. J.* 444, 451 (1955)) and suggests that permitting the congregation of apparent homosexuals, even though carefully supervised, will impair such public respect and confidence. But here again it furnishes nothing affirmative in support of its position which appears to disregard the burgeoning movement towards greater tolerance and deeper understanding of the subject. See Mosk, *supra*, 13 U. C. L. A. L. Rev., at *p.* 645; *Model Penal Code* § 207.5, Comment (Tent. Draft No. 4, 1955).

When in the 1930's the Department of Alcoholic Beverage Control first took its severe position, it acted on the assumption that the mere congregation of apparent homosexuals had to be outlawed to achieve effective control. It of course had no experience to support the assumption but it took the prohibitory course as the safer one for the then fledgling system. At the time, the interests of the patrons in question were given little consideration and were in any event overwhelmed by the then highly felt transitional need for sweeping restraint. Now, in the 1960's, the transitional need as such is long past and it is entirely appropriate that full sweep be given to current understandings and concepts. Under them it seems clear that, so long as the division can deal effectively with the matter through lesser regulations which do not impair the rights of well behaved apparent homosexuals to patronize and meet in licensed premises, it should do so. Such narrower course would be consonant with the settled and just principle that restrictions adopted in the exercise of police powers must be reasonable and not go beyond the public need. See *N. J. Good Humor, Inc. v. Bradley Beach*, 124 *N. J. L.* 162, 168 (*E. & A.* 1940); *Reingold v. Harper*, 6 *N. J.* 182, 192 (1951); *cf. Griswold v. Connecticut, supra*, 381 *U. S.*, at *pp.* 485–486, 85 *S. Ct.* 1678, 14 *L. Ed. 2d*, at *pp.* 515–516; *NAACP v. Alabama*,

*Flowers,* 377 *U. S.* 288, 307, 84 *S. Ct.* 1302, 12 *L. Ed. 2d* 325, 338 (1964).

It must be borne in mind that the division has produced nothing to support any need for continuance of its flat prohibition. Nor has it produced anything to indicate that it could not readily prepare and enforce a fair and sensible regulation which, while permitting apparent homosexuals to assemble in and patronize licensed establishments, prohibits overtly indecent conduct and public displays of sexual desires manifestly offensive to currently acceptable standards of propriety. Such a regulation might well be adopted forthwith to the end that future proceedings would rightly be based on specific charges of improper conduct at the licensed premises rather than, as here, upon general charges of mere congregation which we deem to be unreasonable and legally unsupportable. In the meantime, the discipline imposed in the three cases before us must be set aside, without prejudice, however, to any new charges which the division may prefer against the licensees, or any of them, clearly describing the individual acts alleged to be violative of the provisions in Rule 5 aimed at lewd and immoral conduct within the licensed premises. See *Vallerga v. Dept. of Alcoholic Beverage Cont., supra,* 1 Cal. Rptr., at pp. 498–499, 347 *P. 2d,* at *pp.* 913–914.

Reversed.

PROCTOR, J. (concurring). Since the charges against the three taverns did not specify any particular offensive acts by the patrons, I concur with the majority opinion. However, I wish to emphasize that, although well-behaved homosexuals cannot be forbidden to patronize taverns, they may not engage in any conduct which would be offensive to public decency. In the record before us it appears that there was evidence of conduct (men kissing each other on the lips, etc.) which would form the basis for disciplinary action at least against One Eleven and Murphy's had they properly been charged. A tavern should not provide an arena for

the behavior disclosed by this record. I appreciate that the majority opinion does not say that such conduct will be tolerated, but nonetheless I am expressing my positive view that it should not be.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For affirmance*—None.