Patrick HUGHES, Barbara Frederick and Allen Saft, Plaintiffs,

v.

Frank RIZZO, as Commissioner of Police of the City of Philadelphia, Harold Schick, as Director Fairmount Park Commission and Francis C. Deegan, as Superintendent Fairmount Park Commission.

Civ. A. No. 43199.

United States District Court
E. D. Pennsylvania.

April 11, 1968.

David Pittinsky and Julian E. Goldberg, Philadelphia, Pa., for plaintiffs.

Edward G. Bauer, City Sol., John M. McNally, Jr., Asst. City Sol., Philadelphia, Pa., for defendants.

## OPINION

FULLAM, District Judge.

This is an action under the Civil Rights Act (42 U.S.C. § 1983), brought as a class action under Fed.R.Civ.P. 23, to restrain certain officials of the City of Philadelphia and the Fairmount Park Commission from harassing the plaintiffs and the class they represent in their use of Rittenhouse Square, a small public park.

Plaintiffs exemplify the cultural phenomenon commonly known as the "hippie" movement.[1] The complaint describes the class represented by plaintiffs as consisting of persons who are "unconventional or are regarded by defendants and their agents as unconventional in appearance, manner and life style, as compared with the mainstream of society", and charges unconstitutional arrests and interrogations, and interference with their freedom of association, assembly, and speech.

Plaintiffs sought preliminary injunctive relief, but at the hearings, through the cooperation of counsel, informal arrangements were worked out for the voluntary cessation of the police conduct complained of (without, of course, conceding it had occurred). After the notes of testimony were transcribed, I filed a memorandum opinion and order on August 31, 1967, pointing out that the named plaintiffs were minors and would have to be represented by guardians in this litigation. The record was corrected in this respect on October 5, 1967, after which further conferences were held to review developments and ascertain that the status quo was being maintained without the necessity of further hearings looking toward formal interim relief.

Fed.R.Civ.P. 23(c) (1) directs that "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." I have no doubt that a class action under Fed.R.Civ.P. 23(b) (2) is permissible in this situation, although I am inclined to doubt the adequacy of the definition of the class set forth in the complaint. I have even stronger reservations as to whether minors can bring such an action on behalf of the class; there is considerable doubt as to whether the power of a guardian *ad litem* extends that far, and as to whether this would constitute adequate representation of the class, in any event.

But since the plaintiffs can obviously maintain the action in their own right, and since disposition of this matter has already been too long delayed, I shall defer the class-action issue for later determination, if that becomes necessary.

## I

## SUMMARY STATEMENT OF FACTS

On June 17, 1967, at about 9:15 p. m., members of the Philadelphia police department conducted a raid in the public park known as Rittenhouse Square in the City of Philadelphia, and arrested approximately 27 young persons, including the plaintiffs, Hughes and Frederick. Those arrested were either "hippies", persons conversing with "hippies", or persons who sought to protest, or make inquiries concerning, the arrests. All of the persons arrested were transported in

---

1. This phenomenon is difficult to define. "Hippies" have been variously described as " * * * The first wave of an approaching ocean of technologically unemployable people created by snowballing cybernation in American society" (Musicologist Lou Gottlieb); " * * * escapists from the affluent society that produces and sustains them * * * opposed to the everyday middle-aged values of affluent America—its commercialism, mechanism and bureaucracy; its car culture, hygiene and unquestioned acceptance of the work ethic and the quick buck" (Researcher Bryan Wilson); "young seekers" (Poet Allen Ginsberg); and " * * * the prophetic community" (Poet and Editor Allen Cohen). See, generally, June Bingham: "The Intelligent Square's Guide to Hippieland", N.Y. Times Magazine, September 24, 1967, p. 25; Encyclopedia Britannica, 1968 Book of the Year, p. 790, et seq.

Recent newspaper accounts indicate that the term "hippie" is being, or may soon be, replaced by the term "yippie."

police vehicles to the police station-house at 13th and Thompson Streets, about eight or ten blocks away from the scene of the arrests. All were photographed. All were questioned, individually, by police officers; the questions included inquiries concerning "sexual orientation" and "political affiliation." There were no questions concerning any alleged criminal conduct, but some of those arrested were asked general questions about possession and use of narcotics and dangerous drugs. Those arrested were detained at the police station for about an hour, and then released. No charges of any kind have been lodged against any of the persons arrested. The police photographs remain on file.

On July 5, 1967, at about 7:30 p. m., members of the Philadelphia police force again raided Rittenhouse Square and arrested approximately twenty young persons, including the plaintiff, Allen Saft. All of the persons arrested were transported in police vehicles to the police station-house located at 20th Street and Pennsylvania Avenue. There was some discussion concerning attitudes toward our policies in Viet Nam, but no questioning concerning any supposed criminal activity. No charges were lodged against any of the persons arrested. The draft-cards of some of the young men arrested had been confiscated at the time of the arrest; these were returned at the police-station. All those arrested were released.

At various other times during June and July, 1967, "hippies" and other young persons associating with "hippies" were taken into temporary custody by Fairmount Park guards in Rittenhouse Square. They were taken to the guard-house located at one end of Rittenhouse Square, where they were searched and interrogated, and warned to stop frequenting Rittenhouse Square. Several were forced to leave the Square area, due to threats of physical violence by some Park guards; and many conventionally-dressed young persons were warned against any further contact or association with "hippies."

Some Park guards tend to discriminate against "hippies" in such matters as ordering them not to sit on certain walls or the perimeter of the pool in the Square (while permitting conventionally-dressed persons to do so); other Park guards do not discriminate against "hippies."

The mass arrests of June 17 and July 5 were totally unjustified. There is no evidence that the persons arrested were guilty of any improper conduct, nor did the police have any grounds for belief, or even suspicion, that those arrested were guilty of any crime.

At various times, juvenile runaways have been apprehended in Rittenhouse Square, and the police are constantly required to check the area for persons in that category. But this was not the purpose of the mass-arrests of June 17 and July 5; there was no probable cause to suppose that any of the persons arrested were runaway juveniles; and no comparison was made with any list of persons reported missing. Moreover, it is neither necessary nor reasonable to detain, transport, or interrogate young persons in order to ascertain whether they have been reported missing.

The constant presence of groups of "hippies" in Rittenhouse Square frequently acts as a deterrent to the use of the park by others, particularly elderly persons, having the same right to use the area as the "hippies."

No adequately-detailed regulations governing the conduct of persons in the Square or defining where, particularly in reference to the pool area, persons may congregate, have been promulgated.

## II

### DISCUSSION

There is no evidence that the defendants, or anyone else exercising top-level supervision over the police or park guards, authorized or directed the police activities outlined above. It would indeed be surprising if that were the case. On the other hand, it is not especially reassuring to suppose that under existing administrative regulations, individual po-

lice officers and park guards, or their immediate superiors, are at liberty to ignore the constitutional rights of individuals at their pleasure.

It would be naive to ignore the social frictions, and the pressures—real or imagined—which underlie this litigation. Rittenhouse Square is located in a wealthy center-city residential area, surrounded mostly by high-cost apartments and hotels, and exclusive shops. But residential areas best characterized as Bohemian are fast encroaching, and genuine slums are not far away.

The police undoubtedly received complaints from area residents appalled by the sinister appearance of some "hippies" and the conduct ascribed to them. (For example, there is some suggestion in the testimony that on earlier occasions some "hippies" were guilty of swinging from trees, and similar boisterous conduct). One can almost take judicial notice of the fact that many "hippies" experiment with narcotics and dangerous drugs.[2] And the hearings in this case were persuasive that some are promiscuous; some are overtly homosexual; and some have so completely rejected the middle-class value of cleanliness that their very presence in the courtroom was an olfactory affront. These factors may help to explain, if not to legally justify, conduct by law-enforcement personnel which would otherwise be incredible.

■ But our criminal laws are directed toward actions, not status. Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (narcotics addiction); Driver v. Hinnant, 356 F.2d 761 (4th Cir. 1961) and Easter v. District of Columbia, 124 U.S.App.D.C. 33, 361 F.2d 50 (1966) (chronic alcoholism); see, Perkins v. State of North Carolina, 234 F.Supp. 333 (W.D.N.C. 1964) (homosexuality); Lanzetta v. State of New Jersey, 306 U.S. 451, 59 S. Ct. 618, 83 L.Ed. 888 (1939) (gang membership). It is not a crime to be a "hippie", and the police could not lawfully arrest on the basis of suspicion, or even probable cause to believe, that the arrestee occupied the status of being a homosexual or narcotics addict.

■ On the other hand, it is a crime in Pennsylvania to engage in homosexual acts, or solicit same; and it is a crime to possess or use narcotics or dangerous drugs. When a police officer sees a known homosexual talking to a seeming juvenile, he is not precluded from investigating the situation; but of course, mass arrests without investigation go far beyond permissible limits of police conduct.

■ It is quite clear from the record in this case that the primary motive for the various arrests and interrogations referred to above was a desire to rid Rittenhouse Square of "hippies", or at least those "hippies" thought to be homosexuals, narcotics-users, or otherwise especially undesirable.

There have been throughout our history, many analogous attempts to apply the police-power of government to protect the conventional majority from too-close association with the unpleasant or undesirable minority. Certain legal principles are, by now, reasonably clear:

■ There can be no limitation of the freedom of persons to move interstate, United States v. Guest, 383 U.S. 745, 757, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), even though they may be indigent or otherwise undesirable. Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941). "Individuals coming into or going about a city upon their lawful concerns must be allowed free locomotion upon the streets

2. A recent study, in-depth, of the Haight-Ashbury group by the sociology department of San Francisco State College indicates that 96% had used marijuana, 90% had tried LSD, but few if any had ever tried heroin or any other addictive drug. Encyclopedia Britannica, 1968 Book of the Year, supra, p. 791. Whether these results would be valid for the "hippies" in Rittenhouse Square is highly problematical, but I am convinced, from observation, that several who testified in this case were under the influence of some kind of artificial stimulation.

and public places." Hague v. CIO, 101 F.2d 774, 780 (3d Cir. 1939). See also, Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965).

In the colorful language of Judge Rudkin, the law may not " * * * suppress one class of idlers in order to make a place more attractive to other idlers of a more desirable class." Territory of Hawaii v. Anduha, 48 F.2d 171 (9th Cir. 1931). See, generally: Foote, "Vagrancy-type Law and its Administration", 104 Pa.L.Rev. 603 (1956).

██ The right of free speech and assembly may not be abridged, even if the speakers are so unpopular as to give rise to fears of possible violence. Sellers v. Johnson, 163 F.2d 877 (8th Cir. 1947). And of course, the use of a public park may not be denied merely because the governing body disapproves of the views or objectives of those barred. Niemotko v. State of Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951).

In One Eleven Wines & Liquors, Inc. v. Div. of Alcoholic Beverage Control, 50 N.J. 329, 235 A.2d 12 (Nov. 6, 1967) it was held improper to suspend a beverage license for permitting apparent homosexuals to congregate in the licensed establishment. But cf. Freedman Liquor License Case, 211 Pa.Super. 132, 235 A. 2d 624 (1967).

The cases and authorities cited above make it plain that while most of the limits beyond which police-power may not constitutionally be exercised are clearly-established, the myriad factual situations in which these issues can arise are so varied, and the boundaries in some areas of the law are so nebulous, that any attempt at broad-spectrum injunctive relief should be avoided. Courts are simply not equipped to supervise the day-to-day operations of police officers by injunction. Moreover, the entry of an injunction might tend to encourage the plaintiffs and their associates further to disregard the rights and sensibilities of other users of Rittenhouse Square.

██ Of course, mass arrests without legal justification, and similar harassment, are so clearly improper that, if there were any likelihood of further attempts in that direction, an injunction should issue. But I am satisfied that the defendants, as responsible officials, do not need to be compelled to prevent a recurrence of such violations. Indeed, the course of events since these matters were brought to the attention of the defendants by reason of the hearings in this case, is proof that the plaintiffs' constitutional rights are no longer threatened.

██ As a precautionary measure, jurisdiction will be retained so that appropriate relief can be granted should the need arise.[3] And it seems clear that all record of the mass arrests of June 17 and July 5 should be expunged, and all photographs returned or destroyed. It will be so ordered.

### ORDER

And now, this 11th day of April, 1968, it is ordered:

1. The defendants shall forthwith cause to be physically expunged from all police-department records, and from the records of any law-enforcement agencies to which the same may have been forwarded or referred, all references to the arrests of the plaintiffs and other persons arrested in Rittenhouse Square in company with the plaintiffs on the evenings of June 17 and July 5, 1967; and shall return to those arrested, or destroy, all photographs (including the negatives and all copies, prints, and reproductions of said photographs) taken by or at the direction of the police, of said persons arrested. Certification of compliance with this order shall be filed in this Court within thirty (30) days.

2. In all other respects, plaintiffs' application for preliminary injunction is denied, without prejudice.

3. This Court retains jurisdiction.

---

3. This is, of course, a two-way street, and includes intervention to abate a nuisance, for example, if plaintiffs' conduct should necessitate such action.